### In re David W. SHRIVER, Karen S. Shriver, Debtors.

### FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF LIMA, Plaintiff,

### v.

### David W. SHRIVER, et al., Defendants.

**Bankruptcy No. 82–01422.**
**Adv. No. 83–0048.**

United States Bankruptcy Court,
N.D. Ohio, W.D.

July 15, 1983.

---

Allan D. Dobnicker, Lima, Ohio, for plaintiff.

John D. Noble, Findlay, Ohio, for debtors/defendants.

## MEMORANDUM AND ORDER

WALTER J. KRASNIEWSKI, Bankruptcy Judge.

This matter came on to be heard on the complaint of First Federal Savings and Loan Association of Lima (the Bank) for relief from stay to permit its foreclosure against the farm of David W. Shriver and Karen S. Shriver (Debtors). The Court finding that Debtors' offer to pay $2,000.00 per month to the Bank will adequately protect its interest in Debtors' property, relief from stay will be denied conditioned upon initiation of such payments.

Debtors filed a voluntary petition under Chapter 11 of the Bankruptcy Code on July 1, 1982. On January 18, 1983 the Bank filed its complaint for relief from stay under 11 U.S.C. § 362(d)(1) and (d)(2). From the pleadings, stipulations, and evidence adduced at trial, the following facts have been established.

In October of 1979 Debtors purchased a farm consisting of approximately 100 acres of land, a house, and certain barns, silos, outbuildings and sheds capable of sustaining a dairy and feeder cattle operation, located in Auglaize County, Ohio. To finance such purchase Debtors made a note to the Bank for $190,000.00, plus interest at 11.25% annually, and the Bank took back a mortgage on the property. The Debtors have defaulted on their obligation to the Bank and the amount due to the Bank under such note and mortgage, including principal, accrued interest, and advanced insurance payments was $219,324.85 at trial. The real estate taxes on the Shriver farm are currently in arrears in the amount of $1,166.03. Also the Debtors have given a second mortgage on their farm to BancOhio National Bank to secure their note for $210,000.00 on which, according to Mr. Shriver's testimony, Debtors owed $240,000.00 on the date of the filing of the petition.

The Bank caused an appraisal to be made of the subject property. The appraiser, a licensed real estate salesman and broker with over 40 years experience in appraising farms in both public and private service, estimated that the value of the Shriver farm was $197,000.00 at the time of trial. The appraisal was made after a lengthy written appraisal report based primarily upon an investigation of sales of more or less similar farms in Auglaize County over the past 3 years. The appraiser concluded from his research that, based upon the limited data available due to a generally depressed farm market for the past several years, the Shriver farm land was worth $1,950.00 per acre.

On cross examination the Bank's appraiser was able to point to only one example, in his sampling, of farm land that sold for under $2,000.00 per acre. Other farms in the sampling sold for as much as $3,540.00 an acre, with the majority of the farms from the sample being sold for more than $2,800.00 per acre.

David W. Shriver testified that he and his wife purchased the subject property in 1979 for $325,000.00 and added improvements in the amount of $100,000.00. Based on some limited experience in real estate sales, though presently not licensed to sell real estate, Mr. Shriver opined that the value of his farm was $420,000.00.

Weighing all of the testimony at trial, the Court finds that the value of the Shriver farm, for present purposes, is in the range of $225,000.00 to $275,000.00. The Court so finds, notwithstanding the Bank's appraiser's outstanding credentials and Mr. Shriver's relative lack thereof, due to, among other things, the following factors: the admittedly good condition of the structures on the Shriver farm and their suitability for use as a home, dairy cattle operation, and feeder cattle operation; the sparcity of "comparable" land sales in the Bank's appraisal; the relatively higher values of other land listed in the appraiser's report; and the possible effect of the United States government's payment-in-kind (PIK) program on grain prices and, ultimately, farm land values.

Based upon the above valuation given to the property involved, as more fully explained *infra*, the "interest in property" under 11 U.S.C. § 362(d)(1) entitled to "ade-

quate protection," as illustrated in 11 U.S.C. § 361, is the Bank's claim of $219,324.85 in the Shriver farm. Given the Court's evaluation of the subject property in the range of $225,000.00 to $275,000.00, the Bank, for present purposes, would appear to have a fully secured claim under § 506(a) of the Code.

The testimony of the Bank's collection officer revealed that this position would be maintained, if not slightly improved, by payments of $2,000.00 per month exclusive of the taxes and insurance required to be maintained by the Debtors under their mortgage agreement. This is so since the sum of the two regular $11,428.50 semi-annual mortgage payments required under the parties agreement would be satisfied by Bank's receipt of $24,000.00 per year under the Debtors' offer. As more fully explained below, Debtors appear to be capable of insuring such payment through a leasing of their farm combined with their recent acceptance into the government's PIK program.

At the time of the filing of their voluntary petition under Chapter 11 on July 1, 1982, Debtors had engaged Dale Obringer to manage a dairy cattle operation on their farm. Shortly thereafter, however, the cattle were allegedly repossessed by certain creditors in violation of the automatic stay of 11 U.S.C. § 362(a). This assertedly wrongful repossession is the subject of an adversary proceeding currently pending in this Court in which Debtors have claimed substantial damages.

There has been no plan of reorganization filed with the Court to date. The Debtors are currently living in Florida rent free at the home of Mr. Shriver's father. Mr. Shriver testified that he is currently earning income in Florida by hauling sand and fill dirt.

The Shriver farm is currently occupied by Mr. Obringer who, after repossession of Debtors' dairy cattle, has contracted with Debtors to lease their farm to run a cattle "feeding out" operation. If Debtors can be assured of maintaining possession of their farm, Mr. Obringer reportedly will be assured a continuing supply of cattle without investment costs to himself and will be paid a fixed sum of money per month for each pound gained by the cattle brought to him. Mr. Obringer has contracted to pay Debtors $2,000.00 per month for the use of their farm which money would be used to pay the Bank its current payments on the mortgage.

Debtors have very recently been accepted into the PIK program. Under this arrangement, Debtors will keep 70.9 acres of their farmland idle while receiving over 4,500 bushels of grain to sell at a guaranteed price. Participation in this program should generate at least $13,000.00 to $14,000.00 in guaranteed income for Debtors.

Mr. Shriver testified he intends to return to his farm in the summer of 1983 to begin his own cattle "feeding out" operation similar to that being run by Mr. Obringer. Again, with little or no investment costs, Mr. Shriver projects that he can contract with a Pennsylvania packing company to raise a sufficient number of cattle to generate approximately $40,000.00 in income in a years time. This operation would reportedly be compatible with the operation run by Mr. Obringer.

The activities at the Debtors' Auglaize County farm were reportedly their sole source of income in 1982. In 1981, when Mr. Shriver was also selling real estate, he reportedly earned $82,000.00 from real estate sales and $12,000.00 to $18,000.00 from his farming operation.

## DISCUSSION

■ The Bank is seeking relief from the automatic stay of 11 U.S.C. § 362(a) which, in general terms, "provides for a broad stay of litigation, lien enforcement, and other actions, judicial or otherwise, which affect or interfere with property of the estate, property of the debtor, or property in the custody of the estate." 2 *Collier on Bankruptcy* ¶ 362.01 at 362–6 (15th ed. 1982). The complaint is brought pursuant to 11 U.S.C. § 362(d) which provides as follows:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

The Bank's Complaint seeks relief from the automatic stay of the Bankruptcy Code under both subsections of § 362(d). It asserts both that cause exists to lift the stay due to its lack of adequate protection under § 362(d)(1) and that the debtor does not have equity in the property and that the property is not necessary to an effective reorganization under § 362(d)(2). Since these remedies are phrased disjunctively in the statute, the Bank need establish only one of these grounds to be entitled to relief. *See e.g., La Jolla Mortgage Fund v. Rancho El Cajon Associates,* 18 B.R. 283, 8 B.C.D. 1035 (Bkrtcy.S.D.Cal.1982); *First Connecticut Small Business Investment Co. v. Ruark (In re Ruark),* 7 B.R. 46, 7 B.C.D. 59 (Bkrtcy.D.Conn.1980). Each of these grounds are examined below.

## ADEQUATE PROTECTION

 Although in the present case, the Bank asserts "lack of adequate protection" under § 362(d)(1) as grounds for relief from stay it is clear, from the legislative history, that lack of adequate protection is merely illustrative of what "cause" for granting relief from stay under § 362(d)(1) might be. *See National Bank and Trust Co. v. Williams (In re Williams),* 7 B.R. 234, 237 (Bkrtcy.M.D.Ga.1980).

The lack of adequate protection of an interest in property of the party requesting relief from the stay is one cause for relief, but is not the only cause .... a desire to permit an action to proceed to completion in another tribunal may pro-

vide another cause. Other causes might include the lack of any connection with or interference with the pending bankruptcy case. For example, a divorce or child custody proceeding involving the debtor may bear no relation to the bankruptcy case. In that case, it should not be stayed. A probate proceeding in which the debtor is the executor or administrator of another's estate usually will not be related to the bankruptcy case, and should not be stayed. Generally, proceedings in which the debtor is a fiduciary, or involving postpetition activities of the debtor, need not be stayed because they bear no relationship to the purpose of the automatic stay, which is debtor protection from his creditors. The facts of each request will determine whether relief is appropriate under the circumstances.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 343–4 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6300. *Cf.* S.Rep. No. 989, 95th Cong., 2d Sess. 52–3 (1978), *reprinted* in 1978 U.S.Code Cong. & Ad.News 5787, 5838. The Plaintiff in the instant case has not advanced any independent "cause" for relief from stay other than "lack of adequate protection." The Court having concluded *infra,* however, that Debtors have offered the Bank adequate protection of its interest in the Debtors' property, the mere failure to have made regular mortgage payments for an extended period of time does not constitute "cause" under § 363(d)(1) for granting relief from stay. *See Household Finance Corp. v. Adams (In re Adams),* 27 B.R. 582 (D.C.D.Del.1983) (Equity cushion remaining after exemption and primary lien sufficient to protect second mortgagee even though no current payments made). *But cf. Federal National Mortgage Association v. Pelzer (In re Pelzer),* 15 B.R. 73 (Bkrtcy.E.D.Pa.1981) (Fact that debtors have equity does not necessarily defeat a request for relief from stay "for cause" under § 362(d)(1) in the absence of periodic payments for 29 months).

Critical to a court's determination of whether a secured creditor has been offered "adequate protection" is an evaluation of

what interest of the secured creditor is entitled to "adequate protection". As a constitutional minimum, it is clear that a secured creditor is only protected to the extent of the value of the property. *Wright v. Union Central Life Insurance Co.*, 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940). *See also, Crocker National Bank v. American Mariner Industries, Inc. (In re American Mariner Industries, Inc.)* 27 B.R. 1004, 10 B.C.D. 281 (Bkrtcy. 9th Cir.1983). Consistently, under 11 U.S.C. § 506(a) a secured creditor will only have an "allowed secured claim" to the extent of the value of the collateral. The "interest in property" entitled to adequate protection under § 362(d)(1) then is the creditor's allowed secured claim. "[V]alueless junior secured positions or unsecured deficiency claims will not be entitled to adequate protection." 2 *Collier on Bankruptcy* ¶ 361.01 at 361–13 (15th ed. 1982).

Although "adequate protection" is nowhere defined in the Bankruptcy Code, 11 U.S.C. § 361 sets forth three non-exclusive methods of providing adequate protection to an entity with an interest in property:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee to make periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease, under section 363 of this title or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property:

(2) providing to such entity an additional or replacement lien to the extent that such stay, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

Since Debtors in the present case have offered periodic cash payments to the Bank as adequate protection of its interest, only the necessity and sufficiency of these payments will be discussed.

The Court has previously determined that the value of the Shriver's 100 acre farm for present purposes is somewhere between $225,000.00 and $275,000.00. The claim of the Bank including principal, accrued interest, and advanced insurance payments was $219,324.85 at trial. Furthermore, the costs of foreclosure and sale, including brokerage, escrow, and title costs, should also be taken into consideration. *Harleysville National Bank and Trust Co. v. Kaufman (In re Kaufman)*, 24 B.R. 498 (Bkrtcy.E.D.Pa. 1982). The Bank then, for present purposes, seems fully secured with only a slight to moderate equity cushion protecting its claim.

In evaluating the Debtors' offer of $2,000.00 per month in periodic cash payments to protect the Bank's interest the Court recognizes that certain courts have held such equity cushions alone may suffice for purposes of adequately protecting a secured claim holder during the period of the automatic stay of § 362. *See e.g. Vlahos v. Pitts (In re Pitts)*, 2 B.R. 476 (Bkrtcy.C.D. Cal.1979); *Heritage Savings & Loan Association v. Rogers Development Corp. (In re Rogers Development Corp.*, 2 B.R. 679, 5 B.C.D. 1392 (Bkrtcy.E.D.Va.1980). The equity in this case, given the imprecision of the Court's valuation of the property, may be relatively small or even nonexistent. Given the validity of this approach then, the Court finds insufficient equity to adequately protect the Bank.

The Debtors, however, have offered more than any hypothetical equity cushion to protect the Bank's interest in the property. The $2,000.00 per month offered by Debtors, according to their loan officer, would be more than sufficient to give the

Bank current debt service under its contract, exclusive of taxes and insurance. The collateral for the debt, the Shriver farm, is relatively stable in value, neither increasing nor decreasing in value significantly for present purposes. Under these circumstances, the issue is whether the proffered payments constitute adequate protection. More specifically, the question becomes whether the Bank is entitled to the "opportunity cost" or "use value of the its money", the amount it could obtain if it foreclosed and sold the property and reinvested the proceeds at current interest rates, for the period between the filing of the petition and the confirmation of a plan of reorganization. *Compare Metropolitan Life Insurance Co. v. Monroe Park (In re Monroe Park)*, 17 B.R. 934 (D.C.D.Del.1982); *United Virginia Bank v. Virginia Foundry Co., Inc. (In re Virginia Foundry Co., Inc.)* 9 B.R. 493 (D.C.W.D.Va.1981) *and Midlantic National Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.)*, 4 B.R. 635, 6 B.C.D. 495 (Bkrtcy.E.D.N.Y. 1980) (use value required) *with (In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 8 B.C.D. 1402 (Bkrtcy.S.D.N.Y.1982) and *Crocker National Bank v. American Mariner Industries, Inc. (In re American Mariner Industries)*, 10 B.R. 711, 7 B.C.D. 614 (Bkrtcy.C.D.Cal.1981) *aff'd* 27 B.R. 1004, 10 B.C.D. 281 (Bkrtcy. 9th Cir.1983) (not entitled to use value as adequate protection). This Court holds that only a creditor's allowed secured claim, not his opportunity cost, is entitled to adequate protection and then only to the extent the stay results in a decrease in the value of their interest in property. This conclusion is supported by the language of 11 U.S.C. § 361, its legislative history, and other provisions of the Bankruptcy Code which would render a contrary construction inconsistent. *General Electric Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.)*, 25 B.R. 987, 9 B.C.D. 1332 (Bkrtcy.D.Utah 1982).

Under the provisions of subsection (1) and (2) of § 361 adequate protection may be provided by either making "periodic cash payments" or by providing "an additional or replacement lien" to the extent the stay of

§ 362 *"results in a decrease in value of such property."* (emphasis added). It thus appears from the language of § 361(1) and (2) that the scope of "adequate protection" should be delimited to protecting the secured claim holder from a diminution in the value of the collateral securing the debt. *See In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 8 B.C.D. 1402 (Bkrtcy.S.D.N.Y. 1982). A statement from the Senate Report accompanying the Bankruptcy Reform Act of 1978 supports this conclusion:

Adequate protection in the form of either cash payments or a replacement lien must be provided the creditor *whose collateral is decreasing in value or is being consumed during the stay.* (emphasis added)

S.Rep. No. 989, 95th Cong.2nd Sess. 4, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5790.

Cases reaching the conclusion that adequate protection requires the secured claim holder to be compensated for his opportunity cost rely to a considerable degree on the language of § 362(3) which provides that adequate protection may be provided by "granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such a entity's interest in such property." The indubitable equivalent standard is in turn derived from *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir.1935).

In *Murel,* the debtors filed a petition under Section 77B, 11 U.S.C. § 207, the precursor of Chapter X of the Chandler Act, and obtained an *ex parte* stay of foreclosure of their apartment house. Debtors owed $400,500.00 on their mortgage note and were in arrears for an additional $100,-000.00 for taxes, assessments, interest, and amortization payments. The properties were valued at $540,000.00. Debtors filed a "plan of reorganization" under subdivision (a) of Section 77B proposing to pay interest but no principal to the mortgagee for ten years and thereafter to resume normal amortization of the loan. In the course of reviewing the stay order the court analyzed the prospects for confirmation of the plan

over the dissent of the mortgagee under 11 U.S.C. § 207(b)(5) which required that the plan "provide adequate protection for the realization by [the dissenting class] of the full value of their interest, claims or liens." In construing this provision, Circuit Judge Learned Hand noted that:

> [This] is not, properly speaking, a 'method' at all; it merely gives power generally to the judge 'equitably and fairly' to 'provide such protection,' that is, 'adequate protection,' when the other methods are not chosen. It is this alone which the debtors here invoke. In construing so vague a grant, we are to remember not only the underlying purposes of the section, but the constitutional limitations to which it must conform. It is plain that 'adequate protection' must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or a least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.

75 F.2d at 942.

Application of the *Murel* holding as precedent for cases construing "adequate protection" under § 361(3), however, has been criticized. As one court remarked:

> Although *Muriel Holding* [sic], *supra,* is the source of the phrase 'indubitable equivalent' as used in § 361(3), it should be remembered that the ruling in *Muriel Holding* involved inadequate protection of a secured creditor being 'crammed down' under § 77(b) of the Bankruptcy Act. Therefore, indubitable equivalent in the context of the *Muriel Holding* facts may be precedent for issues arising upon confirmation under § 1129(b)(2)(A)(i)(II), but not to require interest to be paid to an undersecured creditor for being temporarily deprived of possession or use of its collateral.

*Crocker National Bank v. American Mariner Industries, Inc., (In re American Mariner Industries, Inc.)* 10 B.R. 711, 712, 7 B.C.D. 614 (Bkrtcy.C.D.Cal.1981) *aff'd,* 27 B.R. 1004, 10 B.C.D. 281 (Bkrtcy. 9th Cir. 1983).

In addition to confusing adequate protection and confirmation standards, *Murel* improperly focuses on § 361(3) to the exclusion of other methods of providing adequate protection:

> If the stay is responsible for a decline in value, Section 361 states three illustrative methods for proving adequate protection. Some courts, however, have not looked beyond its trilogy of alternatives. Others have insisted on a showing of indubitable equivalence. These approaches miss the mark: they violate the nonprescriptive character of Section 361, and may simply exchange one imponderable for another. Indubitable equivalence is not a method; nor does it have substantive content. Indeed, something 'indubitable' is more than 'adequate'; 'equivalent' is more than 'protection'; hence, the illustration may eclipse the concept. At best, it is a semantic substitute for adequate protection and one with dubious, not indubitable, application to the question of relief from the stay. *See, e.g.* 2 *Collier on Bankruptcy* Para. 361.01(1) at 361–4–361–5 (15th ed. 1980).

*Bankers Life Insurance Co. v. Alyucan Interstate Corp. (In re Alyucan Interstate Corp.),* 12 B.R. 803, 809, 7 B.C.D. 1123, 1126 (Bkrtcy.D.Utah 1981).

In sum, this Court holds that § 361(3)'s "indubitable equivalent" standard should not be interpreted to require a secured creditor to be compensated for the use value of its money in the period between the filing of a chapter 11 petition and confirmation of a plan, dismissal, or liquidation. To do so improperly confuses adequate protection, a method protecting the secured creditor over the short term during the continuance of the automatic stay, with the requirement for "cram down" under § 1129(b)(2)(A)(iii) of providing the "indubitable equivalent" of claims,

a method of finally and permanently fixing the rights of the parties. It also improperly delimits the scope of adequate protection to that illustrated in § 361(3) to the exclusion of other methods illustrated in § 361(1) and (2) and those not illustrated in § 361. The "indubitable equivalent" standard of § 361(3), if anything, is designed to broaden, not circumscribe the range of solutions available to debtors and creditors in accomodating their respective interests in the infinite number of variations possible in their dealings. It should not, as some cases hold, stand for the narrow proposition that a secured creditor is entitled to compensation for the use value of its money.

This conclusion is reinforced by examining the legislative history of § 361. In a comprehensive and well reasoned opinion Judge Ralph R. Mabey, in *General Electric Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.),* 25 B.R. 987, 9 B.C.D. 1332 (Bkrtcy.D.Utah 1982), examined the legislative history of "value", as that term is used in § 361:

> The commission proposal described 'adequate protection,' not as protection of the value of money, but as protection 'to the extent of the anticipated decrease in the value of the collateral as a result of use.' Report of the Commission on the Bankruptcy Laws of the United States, H.Doc. No. 93–137, pt. II, at 237 (1973). The Commission proposal was 'essentially a codification of such cases as ... *In re Bermec,* 445 F.2d 367, (2d Cir.1971).' Report of the Commission on the Bankruptcy Laws of the United States, *supra* at 236. *Bermec* permitted a debtor to use collateral subject to the payment of 'the 'economic depreciation' on the secured creditors' equipment so as approximately to preserve [the] status quo.' *In re Bermec, supra* at 239. Jack Gross, the attorney who represented the creditors in *Bermec,* explained the phrase, 'economic depreciation,' by stating that the court had 'set a hearing and detailed evidence was adduced with respect to the rates of depreciation of the hard security ... and ... the trustee was directed to make monthly payments equal to the rate of

depreciation.' *Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 94th Cong., 2d Sess., Ser. 27, pt. 3, at 176 (1976).

The idea of adequate protection was taken from the Commission proposal and codified in subsequent drafts of the Reform Act. *See* Section 361 of H.R. 8200, 95th Cong., 1st Sess. (1977); Section 361 of S. 2266, 95th Cong., 2d Sess. (1978). The legislative history of these bills, like the Commission Report, did not discuss the value of money: it emphasized 'the decrease in value of the property involved,' H.R.Rep. No. 95–595, *supra* at 339, 'any decrease in the value of such party's collateral,' 124 Cong.Rec. H11,092 (daily ed., September 28, 1978), and 'a means of realizing the value of the original property, if it should decline during the case.' H.R.Rep. No. 95–595, *supra* at 339–340. The Senate Report, like the Commission Report, noted the derivation of adequate protection, in part, from *Bermec,* and observed that '[t]he use of periodic payments may be appropriate where, for example, the property in question is depreciating at a relatively fixed rate. The periodic payments would be to compensate for the depreciation and might, but need not necessarily, be in the same amount as payments due on the secured obligation,' Sen.Rep. No. 95–989, 95th Cong., 2d Sess. 54 (1978). And after differences between the House and Senate bills were resolved, floor leaders concluded that '[a]dequate protection of an interest of an entity is intended to protect a creditor's *allowed secured claim.*' 124 Cong.Rec. H11,092 (daily ed. September 28, 1978); 124 Cong.Rec. S17,409 (daily ed., October 6, 1978).

The authors of The Code thus explained that adequate protection was protection, not of the value of money, nor of any equity cushion, but against depreciation of the collateral when it erodes the allowed secured claim. (footnotes omitted)

25 B.R. at 992–994, 9 B.C.D. at 1335–1337. Judge Mabey concluded, and this Court concurs, that this legislative history contravenes the argument for opportunity cost as adequate protection.

Furthermore, allowance of opportunity cost as adequate protection seems inconsistent with certain other provisions of the Code. *See In re South Village, Inc.,* 25 B.R. at 997, 9 B.C.D. at 1338. An exception to the general rule of § 502(b)(2) that postpetition interest is not permitted in bankruptcy is found in § 506(b)'s allowance of interest accrual to the oversecured creditor at the contract rate to the extent the collateral's value exceeds the amount of the indebtedness. Thus, under the Code, the oversecured creditor is protected during the delay prior to confirmation, conversion, or dismissal through *accrual* of interest on his allowed secured claim. Opportunity cost, in contrast, permits the undersecured creditor to be *paid* interest and at the market not the contract rate. It thus contravenes both the rule and the exception. Also, payment of interest at the market rate seems inconsistent with § 1124(2)'s recognition of debtor's right to cure a default and reinstate the contract on its original terms.

In contrast to those courts which have held that an undersecured creditor is entitled to the compensation for being denied the right to foreclose, liquidate and reinvest its money at current market interest rates, this Court concludes that neither the undersecured nor the oversecured creditors is entitled to postpetition payments for the use value of its money. Adequate protection, in both instances, should compensate the secured creditor for any decrease in value of its allowed secured claim which results from the imposition of the automatic stay. Protection from undue delay between the filing of a petition under Chapter 11 and confirmation lies in the creditor's right to seek dismissal under § 1112(b) or file its own plan under § 1121(c). The oversecured creditor is given additional protection through interest accrual pursuant to § 506(b) during the stay. Finally, to the extent that the adequate protection provided inadequately compensates the holder of a secured claim from any decrease in value of its interest resulting from the stay, § 507(b) grants such claim holder a superpriority claim.

In light of the foregoing, the conclusion that Debtors have offered the Bank adequate protection follows, in the present case, from an analysis of the facts shown and the respective duties of the Bank, the Debtor, and the Court under the Code. Pursuant to 11 U.S.C. § 362(g) "the party requesting [relief from stay] has the burden of proof on the issue of the debtor's equity in property" and "the party opposing [relief from stay] has the burden of proof on all other issues." Considering that both the first (the Bank's) and the second mortgages on the Shriver farm total an amount in excess of $450,000.00 and the Court's determination that it had a value between $225,-000.00 and $275,000.00, the Bank has shown a lack of equity in the property, see discussion *infra,* or sufficient "cause" under § 362(d)(1) to shift the burden of going forward to the Debtors who bear the burden of showing that the Bank is adequately protected. *See 2 Collier on Bankruptcy* ¶ 362.10 at 362–58 (15th ed. 1982). The Debtors have proposed $2,000.00 per month as offering adequate protection to the Bank and, since the Bank objects to this, it is for the Court to determine the sufficiency of the protection offered. It is not the Court's duty to provide it. As the House Report indicates:

> This section specifies the means by which adequate protection may be provided. It does not require the court to provide it. To do so would place the court in an administrative role. Instead, the trustee or debtor in possession will provide or propose a protection method. If the party that is affected by the proposed action objects, the court will determine whether the protection provided is adequate.

H.R.Rep. No. 95–595, *supra* at 338. *Accord* S.Rep. No. 95–989 *supra* at 49, U.S.Code Cong. & Admin.News 1978 at 5835, 6295. Since the Shriver farm is relatively stable in value and the periodic payments offered are more than sufficient to offset accruing

taxes, penalties, and insurance which, if not paid, would erode the value of the Bank's allowed secured claim, Debtors have offered adequate protection to the Bank. To the extent that the amount paid exceeds any necessary taxes, penalties and insurance, or amounts subsequently found necessary for depreciation, depletion, or deflation of real estate values, it should be applied to the amount of the secured claim under § 506(a). *See, In re American Mariner Industries, Inc., supra* 10 B.R. at 714, 7 B.C.D. at 615. The complaint for relief from stay pursuant to § 362(d)(1), however, should be denied.

SECTION 362(D)(2) RELIEF

■ The Debtors having proposed a means of adequate protection of the Bank's interest in their farm which the Court found acceptable, there are insufficient grounds for relief from stay under § 362(d)(1). This does not preclude them from obtaining relief from stay, however, if, pursuant to § 362(d)(2), they can prove a lack of equity in the property and the Debtors fail to prove that the property is necessary to an effective reorganization. As stated previously, § 362(d)(1) and (d)(2) present alternative tests for determining if relief from stay is appropriate. The failure to obtain relief pursuant to § 362(d)(1) does not preclude granting relief under § 362(d)(2). *See e.g., La Jolla Mortgage Fund v. Rancho El Cajon Associates,* 18 B.R. 283, 8 B.C.D. 1035 (Bkrtcy.S.D.Cal. 1982); *First Connecticut Small Business Investment Co. v. Ruark (In re Ruark),* 7 B.R. 46, 7 B.C.D. 59 (Bkrtcy.D.Conn.1980); *Miners National Bank v. Schramm (In re Schramm),* 12 B.R. 608 (Bkrtcy.E.D.Pa. 1981). The court must find, however, that both conditions under § 362(d)(2) exist; one, under § 362(d)(2)(A), there must be a showing that the debtor has no equity in the property and, two, pursuant to § 362(d)(2)(B), there must be a showing that the property is not necessary to an effective reorganization. *First National Bank v. L.H. and A. Realty, Inc.,* 24 B.R. 81 (Bkrtcy.D.Vt.1982); *Besler· v. Northwest Production Credit Association (In re Besler),* 19 B.R. 879, 9 B.C.D. 404 (Bkrtcy.D.S. D.1982); *La Jolla Mortgage Fund v. Rancho El Cajon Associates, supra.*

■ The issue arises, in determining the question of the debtor's equity in the property under § 362(d)(2)(A), whether all the encumbrances on the subject property are to be considered or whether the interest of non-joining junior lien creditors should be ignored. *Compare Harleysville National Bank and Trust Co. v. Kaufman (In re Kaufman),* 24 B.R. 498 (Bkrtcy.E.D.Pa. 1982); *La Jolla Mortgage Fund v. Rancho El Cajon Associates, supra;* and *North East Federal Savings and Loan Association v. Mikole Developers (In re Mikole Developers, Inc.),* 14 B.R. 524 (Bkrtcy.E.D.Pa.1981) (all encumbrances considered) *with Central Florida Production Credit Association v. Spring Garden Foiliage, Inc. (In re Spring Garden Foliage, Inc.)* 15 B.R. 140 (Bkrtcy.M. D.Fla.1981) (junior encumbrances unimportant if debtor has equity cushion over senior encumbrances). This Court agrees with the former authorities and holds that all encumbrances on the subject property are to be considered in determining if the debtor has equity in the property under § 362(d)(2)(A), whether or not all the secured claimholders have requested relief from the stay.

The opposite view, that only the senior encumbrances should be considered, seems to confuse the question of an "equity cushion" or *value over and above the senior encumbrances's claim* as "adequate protection" under § 362(d)(1) with whether there is any "equity" in the property or *value above all secured claims against the property that can be realized from the sale of the property for unsecured creditors* under § 362(d)(2)(A). As Judge Meyers ably explained in *La Jolla Mortgage Fund v. Rancho El Cajon Associates,* however, there is a significant difference:

Shortly after the Code became effective, this Court in *In re San Clemente Estates,* 5 B.R. 605, 6 B.C.D. 838 (Bkrtcy.S.D.CA. 1980), recognized that in appropriate cases the value of the collateral itself could provide adequate protection. Both

this Court, and others, referred to this as the 'equity cushion' approach. . . . It has been defined as value in the property above the amount owed to the creditor with a secured claim, that will shield that interest from loss due to any decrease in the value of the property during the time the automatic stay remains in effect. *In re Roane,* 8 B.R. 997, 1000 (Bkrtcy.ED PA.1981), *aff'd,* 14 B.R. 542 (D.Ct.E.D. PA.1981). While this approach is valid, the instant case demonstrates that the phrase 'equity cushion' is a misnomer. By including the word 'equity,' we have created some confusion. 'Equity' is the value, *above all secured claims* against the property, that can be realized from the sale of the property for the benefit of the unsecured creditors. *See Comment, supra,* 17 San Diego L.Rev. at 1123. Under the requirements of Section 362(d)(2)(A), equity in the debtor's property, or lack thereof, can be relevant and under Section 362(g)(1) the creditor, as the party requesting relief, has the burden of proof on the issue of the existence of equity. However, in considering whether the debtor has provided adequate protection for a creditor's secured claim, we are not concerned with the availability of equity for unsecured creditors. Instead, we are concerned with whether there is sufficient value in the collateral to protect the secured claim from diminution. A more apt and descriptive phrase would be 'value cushion.' (footnotes omitted)

18 B.R. at 287–288, 8 B.C.D. at 1037.

Whatever the ultimate utility of the "equity cushion" approach for issues under § 362(d)(1), it should be rejected when considering the question of "equity", as defined above, for issues under § 362(d)(2)(A). If there is equity in the property, even if it is unnecessary to an effective reorganization, the property has utility for the Chapter 11 debtor if it can be sold and the net proceeds over and above all encumbrances used for operating capital or to fund a plan of reorganization. If there is no equity and the property is not necessary to an effective reorganization, the property has no utility for the Chapter 11 debtor and is a hindrance in his efforts to emerge from the reorganization as an intact economic entity. Only under the former circumstances then, does continuance of the automatic stay seem to strike the appropriate balance between the creditor's rights to recourse to its collateral, temporarily stayed in an effort to permit the debtor a chance to reorganize, and the debtor's right to attempt a bona fide reorganization.

In the present case, although it has been previously determined that Debtors have no equity in their farm, since the Court finds it necessary to an effective reorganization, the Bank's complaint must fail under § 362(d)(2).

In determining whether the Debtors have met their burden under § 362(d)(2)(B) in showing that the property is "necessary to an effective reorganization" it should be noted that "[t]he mere fact that the property is indispensible to the Debtors' survival is insufficient, without more, to deny relief from the automatic stay" where there is no equity in the property. *North East Federal Savings and Loan Association v. Mikole Developers, Inc. (In re Mikole Developers, Inc.),* 14 B.R. 524, 527 (Bkrtcy.E.D.Pa.1981). The requirement that the property "be necessary to an effective reorganization" requires a finding by the court that "there is a reasonable possibility of a successful reorganization within a reasonable time." *Terra Mar Development Corp. v. Terra Mar Associates (In re Terra Mar Associates),* 3 B.R. 462, 466; 6 B.C.D. 150, 152 (Bkrtcy.D.Conn.1980). In addition, there should be a showing that the property has a "part to play", *La Jolla Mortgage Fund v. Rancho El Cajon Associates,* 18 B.R. at 291, 8 B.C.D. at 1039, or that it is "essential", *In re Mikole Developers,* 14 B.R. at 526, in the reorganization effort.

The property in the present case, the Shriver farm, is the sole basis of the Debtors' business and thus the necessary connection to the reorganization has been established. More importantly, the Debtors

have shown a reasonable possibility of a successful reorganization within a reasonable time. Thus, the projected income and expenses from the Shriver farm operation including the discovery, on the eve of trial, that the Debtors had been accepted into the PIK program, shows that an "effective" reorganization effort is reasonably likely. *See Besler v. Northwest Production Credit Association (In re Besler),* 19 B.R. 879, 9 B.C.D. 404 (Bkrtcy.D.S.D.1982). The Court so finds notwithstanding the expiration of the Debtors' exclusive right to file a plan or reorganization for 120 days after the Order for Relief under § 1121(b). *Cf. Roslyn Savings Bank v. Comcoach Corp. (In re Comcoach Corp.)* 19 B.R. 231, 8 B.C.D. 1077 (Bkrtcy.S.D.N.Y.1982) (when 120-day exclusive period had not run, court gave debtor "benefit of the doubt" that reorganization feasible). This is not to condone any inability of the debtor to effectuate a plan or unreasonable delay that is prejudicial to creditors, which are grounds for conversion to a Chapter 7 or dismissal of a reorganization proceeding under 11 U.S.C. § 1112(b). Indeed, as pointed out in the Court's discussion of adequate protection under § 362(d)(1), the Bank still has the remedy of moving to convert or dismiss for any further delay on Debtors part. The determination, whether there is a reasonable possibility of a successful reorganization within a reasonable time, however, will be made only after a party in interest files its complaint for relief from stay. Delay in filing the complaint may result in changed circumstances increasing the likelihood of a successful reorganization.

For the foregoing reasons, it is hereby,

ORDERED that the automatic stay against Plaintiff be continued upon condition that Debtors commence within 10 days of the date of this Order, and on the first day of each month thereafter, payments to the Plaintiff of $2,000.00 per month. It is further,

ORDERED that upon the failure of Debtors to make any of the above ordered payments within the time limits described,

upon ex parte application, the Plaintiff be granted immediate relief from stay.