In re Burt H. ROWE and Anne B. Rowe, Debtors.

In re ROLANCO, INC., Debtor.

In re SALINE VALLEY LAND COMPANY, INC., Debtor.

Bankruptcy Nos. 83–00144(SE)–08, 83–00143(SE) and 83–00142(SE).

United States Bankruptcy Court, E.D. Missouri, Southeastern Division.

May 16, 1984.

Fred E. Arnold, St. Louis, Mo., for debtors.

Steven N. Cousins, Atty. at Law, St. Louis, Mo.

Paul H. Berens, Atty. at Law, Cape Girardeau, Mo.

## MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy Judge.

Movant, The Mutual Life Insurance Company of New York, seeks relief from the automatic stays under 11 U.S.C. § 362(a) in order to foreclose its deed of trust on parcels of farm land belonging to Debtors Burt and Anne Rowe located in Scott County, Missouri, and totaling 2,605.78 acres. Movant asserts that the Debtors are in default on the promissory note which the property in question secures and that Debtors lack equity in this property, cannot effectively reorganize, and cannot afford Movant adequate protection of its security interests.

## FACTS

On January 14, 1980, Debtors executed a promissory note in the amount of $3,500,-000, and a document entitled Missouri Deed of Trust and Security Agreement, both in favor of the Movant. As discussed previously, the deed of trust encumbers 2,605.78 acres of farm land in Scott County, Missouri. The promissory note calls for payments of $202,965.00 on January 1st and July 1st of each year until July 1, 2005. Debtors admit that they did not make the January 1, 1983 payment and have offered no evidence that they have made any such payments since that date. Debtors all filed their petitions for relief under Chapter 11 of the Bankruptcy Code on April 25, 1983.

At the hearing on the instant motion, Movant offered the testimony and written report of Charles Pilmer, a real estate appraiser. Mr. Pilmer had inspected the properties in question and had concluded that, as of June 6, 1983 and the date of hearing, these properties were worth $2,747,800. His appraisal was based on comparisons of similar farm sales to the individual tracts comprising the subject properties, together with adjustments for those features which differed from the features of the Debtors' properties. In his testimony, Mr. Pilmer expressed the opinion that farm real estate had generally

decreased twenty per cent (20%) since 1981 in that area of the state including and surrounding Scott County, Missouri. However, this downward trend had "bottomed out" in March or April of 1983, and market prices for farm land had stabilized since then.

For their part, Debtors introduced into evidence a copy of an October 3, 1979 appraisal report on the value of the subject properties made for the Movants when they granted the Debtors the loan in this case. In the 1979 report, the appraiser, James A. Hendren, estimates the value of the property to be $4,960,000, or more than $2,000,000 higher than appraiser Pilmer's 1983 estimate.

EQUITY

The Court finds that the value of the subject property is $2,747,800. Debtors' counsel in his closing argument at the hearing, conceded that he was not challenging Mr. Pilmer's evaluation of the property. Further, the appraisal made prior to the loan lacked any basis in other comparable sales and seemed to rely most heavily on the appraiser's opinion of the Debtors' credit worthiness in recommending that the loan be made.

Hence, since the principal balance of the indebtedness alone at the time of the filing of the Chapter 11 petition was $3,317,-434.23, Debtors have no equity in these lands and Movant is an undersecured creditor.

*Necessity For An Effective Reorganization*

The acreages in question, 2,605.78 acres in total, comprise nearly half of all the farm land which Debtors own and use in their farming operation. Loss of the use of this property and of its potential to generate crop income would seriously impair Debtors' chances of reorganizing.

Some courts take the position that, in this situation, Debtors must also demonstrate a reasonable likelihood that they can successfully reorganize or suffer a lifting of the automatic stays, *In re Rogers*, 2 B.R. 679, 1 C.B.C.2d 499 (Bkrtcy.E.D.Va.

1980). While the issue of the feasibility of Debtors' current proposed plan of reorganization has never been fully litigated before this Court, the projection given by the Debtors at this and other hearings persuades the Court that, assuming favorable weather conditions and favorable commodity prices, Debtors could rehabilitate their farming operations. The Court is quite aware that assuming the existence of favorable weather conditions and favorable commodity prices is always an "iffy" set of assumptions but the record before the Court does not warrant, at least at this point, a finding that Debtors have no reasonable chance of rehabilitating their farm business.

*Adequate Protection*

Movant also urges that the lack of equity in the property and Debtors' failure to pay it anything since January 1, 1983, requires a finding by this Court that it lacks adequate protection for its security interest and under 11 U.S.C. § 362(d)(1) must be granted relief from the automatic stay. Movant does not precisely state its reasoning behind this assertion and, therefore, the Court must consider the application of the concept of "adequate protection" to the case at bar from various perspectives.

First, from the perspective of actual depreciation in the value of the collateral, the evidence at the hearing clearly showed that the value of the farm properties at hand, after perhaps declining in value from 1981, stabilized in value in March or April of 1983 and has continued to remain level since then. Thus, there is no evidence that Movant's collateral is declining in value or has declined as a result of the automatic stays and Movant's claim of inadequate protection cannot be premised on that ground.

Second, Movant does appear to be sustaining a loss in the sense that the automatic stays under the Code have deprived it of the opportunity to liquidate its collateral and re-invest the proceeds to generate income. In other words, while Movant is not losing money in terms of the actual value of the collateral, it is losing money by

being deprived of the "time value" of the collateral. Given current interest rates computed on a value of over 2.7 million dollars, the loss, even on a daily basis, is substantial. Yet, the courts are sharply divided on the issue of whether Congress intended to include "loss of time value or opportunity cost" as a loss or risk compensable under the concept of adequate protection.

Those cases that find such an intent largely point to section 361(3) which provides that

> Such adequate protection may be provided by—...
>
> (3) granting such other relief ... as will result in the realization by such entity of the *indubitable* equivalent of such entity's interest in such property. (Emphasis added)

See *In re Monroe Park*, 17 B.R. 934 (D.Del.1982); *In re Virginia Foundry*, 9 B.R. 493 (W.D.Va.1981); *In the Matter of Anchorage Boat Sales, Inc.*, 4 B.R. 635 (Bkrtcy.S.D.N.Y.1980).

The phrase "indubitable equivalent" is also used in section 1129(b)(2)(A)(iii). The legislative history of the Code makes it clear that, as this phrase is used under the foregoing subsection, it "is intended to follow the strict approach taken by Judge Learned Hand in *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir.1935), *see* Senate Report No. 95–989, 95th Cong.2d Sess. (1978) 126, U.S.Code Cong. & Admin.News 1978, p. 5787. In that case, Judge Hand stated at page 942 of the opinion:

> (d) The last is not, properly speaking, a "method" at all; it merely gives power generally to the judge "equitably and fairly" to "provide such protection," that is, "adequate protection," when the other methods are not chosen. It is this alone which the debtors here invoke. In construing so vague a grant, we are to remember not only the underlying purposes of the section, but the constitutional limitations to which it must conform. *It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent .of payment now.* Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence. (Emphasis added)

Other courts have disagreed with this interpretation and have noted that subsection 361(3) is only illustrative of one means of adequate protection and does not circumscribe all other means of adequate protection, *In re Shriver*, 33 B.R. 176 (Bkrtcy.N.D.Ohio 1983). Further, courts have held that section 361 must be construed to be consistent with section 502(b)(2) of the Code which precludes post-petition interest on unsecured claims and section 506(b) which allows interest on a secured claim only to the extent that there is additional value in the security to cover it, *In re Saypol*, 31 B.R. 796 (Bkrtcy.S.D.N.Y. 1983); *In re American Mariner Industries, Inc.*, 27 B.R. 1004 (Bkrtcy.App. 9th Cir. 1983); *In re South Village, Inc.*, 25 B.R. 987 (Bkrtcy.D.Utah 1982).

After reviewing these and other authorities and for the reasons stated in those cases, the Court adopts the position of the latter-cited authorities that the concept of adequate protection does not in *all* instances require protection of or compensation solely for the time value of an undersecured creditor's collateral. In the absence of much more explicit language supporting it either in the Bankruptcy Code or in the various documents comprising the legislative history of the Bankruptcy Code, this Court cannot impose such a rigid requirement in light of its obvious conflict in this instance with the intent of sections 502(b) and 506(b). Further, as was stated by the court in *In re American Mariner Industries, Inc.*, *supra* at p. 1014:

> The policy of the Code, in litigation involving the automatic stay, particularly in a Chapter 11 or reorganization setting,

is to place matters in a holding pattern so as to permit an opportunity, where there are prospects for survival, for time to allow the reorganization to develop for the benefit of the debtor and its creditors. A temporary balance is thereby struck which defers access of the secured creditor to the collateral but provides for maintenance of its value. This period of time is not illimitable and should be measured by what is reasonable under the circumstances. The trial court in the instant case recognized this, pointing out that the creditor was not without recourse in bringing to its attention the issue as to how long the stay, conditioned as it was, should subsist.

The language of § 361 and its legislative history support the conclusion that it was the intention of Congress to provide a balance whereby deferral of recourse to collateral would be attended by provision for ensuring maintenance of its value. This balance does not require an additional increment for market rate interest on the value of such collateral.

However, on the other hand, the Court believes that in some instances basic principles of equity, if not also the concept of adequate protection, require compensation to an undersecured creditor for the continued denial of access to its collateral, see 2 *Collier on Bankruptcy*, pp. 361–12 and 361–13 (15th Ed.).

During the growing season of 1983, Debtors were not required to pay any form of debt service or compensation to Movant for the use of its collateral, the 2,605.78 acres of farm land in question. Unless the Court orders otherwise, the Debtors will receive another such "free ride" for the 1984 growing season. This is unreasonable and unjust.

At the hearing, there was evidence that farm land in the area surrounding the farms at issue was renting for between $20 and $50 per acre. Compensation to the Movant in the amount of $50 per acre or $130,289 for the entire farm, represents an amount less than half the amount required to pay the annual accrual of interest at the rate in Movant's promissory note on Movant's 2.7 million dollar collateral. Such a rate is reasonable and equity requires that Debtors pay it to Movant for the continued utilization of its collateral.

A separate order consistent with this opinion will be entered this date.