In re SMITHFIELD ESTATES,
INC., Debtor.

UNITED STATES of America, Plaintiff,

v.

SMITHFIELD ESTATES,
INC., Defendant.

Bankruptcy No. 8300715.

United States Bankruptcy Court,
D. Rhode Island.

April 12, 1985.

Frank Licht, Robert N. Huseby, Sr., Letts, Quinn & Licht, P.C., Lauren E. Jones, Jones & Aisenberg, Providence, R.I., for debtor.

Charles L. Schlumberger, Dept. of Justice, Civ.Div., Washington, D.C., for plaintiff.

Matthew J. McGowan, Boston, Mass., Trustee.

## DECISION DENYING MOTION FOR RELIEF FROM AUTOMATIC STAY

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Heard on the motion of the U.S. Department of Housing & Urban Development (HUD), for relief from the automatic stay, 11 U.S.C. § 362(d), and for leave to foreclose its mortgage on the debtor's real estate. HUD maintains that the debtor-in-possession (Smithfield Estates, Inc., hereinafter, debtor) has no equity in the mortgaged property; that the property is not necessary to an effective reorganization; and that HUD's interest as mortgagee is not adequately protected. Upon consideration of all the evidence and the arguments, and for the reasons that follow, we conclude that relief from stay would be improvident at this time, and will deny the motion. However, continuation of the stay is subject to the conditions enumerated below and which are necessary to adequately protect HUD's interest.

### Findings and Conclusions[1]

1. The debtor's principal asset is a group of apartments known as Villa Versailles, located in North Providence, Rhode Island. The seven building complex includes 13 efficiency units, 113 one-bedroom and 31 two-bedroom units, 12 townhouses, an indoor pool, health club, clubhouse and cocktail lounge.

2. On August 1, 1977, about seven years prior to filing this petition for reorganization under Chapter 11, the debtor granted a mortgage to BMFC, Inc. as security for a loan, insured by HUD, in the amount of $2.4 million. When the debtor defaulted in 1978, BMFC exercised its right under the mortgage to receive immediate payment, and simultaneously assigned the mortgage to HUD. At the time of the assignment, the balance due on the note was $2.9 million.

3. Thereafter, the debtor and HUD began a long period of negotiation during which the debtor disputed the balance, and submitted several workout proposals.[2]

4. When those negotiations finally broke down, HUD began foreclosure pro-

---

1. This opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rules 9014 and 7052.

2. Also during this time, the debtor, through its principal, Joseph Matteo, managed to completely exhaust whatever good will or patience HUD may have had at the beginning of their business relationship.

ceedings and on the eve of HUD's scheduled foreclosure sale of the property, the debtor filed the instant petition for reorganization under Chapter 11, which triggered the automatic stay provisions of 11 U.S.C. § 362(a).

5. Since the filing of the petition, the debtor has failed to make post-petition mortgage payments, and HUD has kept pressure on for the relief to which it claims it is entitled.

6. Due to large pre-petition and post-petition arrearages, approximately $4.7 million is now due on the accelerated indebtedness to HUD.[3] Joseph Matteo testified that in his opinion the amount due is several hundred thousand dollars less than HUD alleges, but no other evidence was introduced in support of that assertion. Therefore, Matteo's contention is rejected, and we accept HUD's figure as the correct balance.

7. The debtor's Plan of Reorganization involves conversion of the property from rental apartments to condominium units. The proposed conversion is dependent, among other things,[4] upon the infusion of $1 million in investment capital, together with rental increases to take effect while the condominium conversion is in process.

8. HUD's appraiser, William Floriani, placed the market value of the property, as an apartment complex and after necessary repairs, at $3.3 million. That appraisal was made more than a year before the hearing, and the income calculations are based on below-market-value rental figures. Floriani did not appraise the complex as a potential condominium property, and he gave no reason why he did not consider other higher uses to which the property could be put.

During cross-examination, however, he acknowledged that his opinion of value would increase, if treated as a potential condominium complex, to somewhere between $4.2 to $4.5 million. In this regard Floriani's formal appraisal ignores the generally accepted principle that "the most commercially reasonable disposition practicable in the circumstances should be the standard [of value] universally applicable in all cases ..." *In re American Kitchen Foods, Inc.*, 2 B.C.D. 715, 722 (N.D.Me.1976), *quoted in Heritage Savings and Loan Assoc. v. Rogers Development Corp. (In re Rogers Development Corp.)*, 2 B.R. 679, 684 (Bankr.E.D.Va.1980); *see also Imperial Bank v. El Patio, Ltd. (In re El Patio, Ltd.)*, 6 B.R. 518 (Bankr.C.D.Cal.1980).

9. The debtor's appraiser, Peter S. Romano, places the market value of the property at $5.2 million as apartments, and $5.5 million, present net worth, if converted to condominiums. Romano's appraisal is more recent, performed as of August 1, 1984, but several of his comparable sales were of newly constructed condominiums,[5] situated on or near waterfront in areas more desirable than that of the subject property. Their sale prices were not adjusted sufficiently, vis-a-vis the subject property, in our view. In this regard, Mr. Romano's opinion of value is weakened somewhat.

10. Because of the vulnerability of both appraisals, we conclude that neither opinion precisely represents the market value of the Villa Versailles, but based on what we are able to deduce from all the evidence, we find that the market value of the debtor's real estate, at this time, falls within the range of $4.5 to $5 million.

---

3. This figure, as of June 30, 1984, is comprised of:

| | |
|---|---|
| principal balance | $2,924,000 |
| accrued interest | 1,404,000 |
| service charges | 43,000 |
| tax advances and interest | 371,000 |
| estimated foreclosure costs | 9,000 |

HUD's Exhibit # 11.

4. A hearing on HUD's objection to the Disclosure Statement was held on August 24, 1984,

and it is our conclusion that the disclosure statement contains adequate information to meet the requirements of 11 U.S.C. § 1125(a)(1). *See* Order dated April 12, 1985, approving disclosure statement.

5. We think it is not subject to reasonable dispute that converted condominium units designed as apartments are not as desirable as condominiums originally designed and built for that use.

11. With an indebtedness to HUD of $4.7 million, and with principal and interest payments running at $32,000 per month, one fact is clear—any slim equity cushion which currently exists will soon dissipate if regular payments are not commenced immediately and made regularly.

### Discussion

Under 11 U.S.C. § 362(d), a creditor may seek relief from the automatic stay on two grounds: (1) when the debtor lacks equity in the property, *and* the property is not necessary to an effective reorganization; or (2) for cause, which includes lack of adequate protection. HUD argues it is entitled to relief on both grounds.

On the evidence presented, HUD has not satisfied the first condition which would entitle it to relief from stay. Under § 362(d)(2) the creditor has the burden of proving lack of equity in the subject property. *See* 11 U.S.C. § 362(g)(1); *Green Mountain Bank v. Jamaica House, Inc. (In re Jamaica House, Inc.),* 31 B.R. 192 (Bankr.D.Vt.1983). In determining whether the debtor has equity, all encumbrances on the subject property are considered. *See First Federal Savings & Loan Assoc. of Lima v. Shriver (In re Shriver),* 33 B.R. 176 (Bankr.N.D.Ohio 1983). In this case, since HUD is the only secured creditor, the equity is the difference between HUD's interest and the market value of the subject property, and HUD has not established that the debt exceeds the value of the property serving as collateral (although the equity margin is slim [6]). Furthermore, lack of equity alone does not warrant relief from stay, unless it is also shown that the property is not necessary to an effective reorganization. Section 362(d)(2) is phrased in the conjunctive, i.e., that there is no equity, *and* that the property is not necessary to an effective reorganization. *See* 11 U.S.C. § 362(d)(2). *See also La Jolla Mortgage Fund v. Rancho El Cajon*

*Assoc.,* 18 B.R. 283, 290 (Bankr.S.D.Cal. 1982).

In this case, the property in question is clearly necessary to an effective reorganization, since it is the debtor's only asset. Without the property, there is nothing to reorganize.

As HUD correctly points out, however, it is not enough that the property is indispensable to the debtor's survival. *See In re Hutton-Johnson Co., Inc.,* 6 B.R. 855 (Bankr.S.D.N.Y.1980); *In re Terra Mar Assoc.,* 3 B.R. 462 (Bankr.D.Conn.1980). It must also be shown that there is a "reasonable possibility" of a successful reorganization within a reasonable time. *See In re Shriver, supra; In re Ramco Well Service, Inc.,* 32 B.R. 525 (Bankr.W.D.Okla. 1983). The debtor has submitted a plan and disclosure statement which demonstrate that reorganization is possible. *See Matter of Pleasant Valley, Inc.,* 6 B.R. 13 (Bankr.D.Nev.1980). According to the debtor's projections, the plan will generate gross proceeds in excess of $7 million, if consummated. As the court noted in *In re El Patio, Ltd.,* a case factually similar to the one before us:

> If the condominium conversion is allowed to proceed, the property will be worth between $5 million and $6 million, in which event sufficient equity would be created to satisfy the Bank's claim in full including interest, penalties, costs, and attorneys' fees, as well as the claims of all other creditors.... This court has the duty to preserve whatever equities the Debtor may have not only for rehabilitation purposes, but to protect the rights of all creditors in the potential fund ...

6 B.R. 521–522.

The disclosure statement and plan in the instant case appear to be the result of substantial effort and commitment to restructuring the debtor's property from rental apartments to saleable condominium

---

**6.** We recognize that the real estate valuation process is imprecise, at best, comprised of many subjective approximations, but after weighing all the evidence, we are unable to conclude that equity in the subject property is non-existent, or that the debtor has no interest to be protected at this time. *See Sanders v. Tucker (In re Tucker),* 5 B.R. 180, 182 (Bankr.S.D.N.Y.1980).

units. Upgrading of the first building scheduled for condominium conversion has already occurred. The plan anticipates the quick infusion of investment capital of $1 million, and provides for HUD to receive, upon confirmation, an immediate payment of $500,000. Under the plan HUD will be paid in full. Although the proposed plan is by no means problem-free, and while confirmation is dependent upon the approval of various cram-down provisions which will be considered at the hearing on confirmation, courts at hearings on motion for relief from stay are frequently required to determine whether the property in question is necessary to an effective reorganization, without the benefit of having any plan at all to review. *See Rogers Development Corp., supra.* This, in contrast, is a case where the disclosure statement has been approved,[7] a plan has been proposed which will be confirmed or rejected in the relatively near future, and where we have concluded that there exists the reasonable possibility of a successful reorganization.

HUD's alternate request for relief is based on alleged lack of adequate protection, due to the absence of an equity cushion in the subject property. For the following reasons, we reject the equity cushion test as the sine-qua-non for adequate protection. "Adequate protection" is a flexible concept to be tailored to the facts and circumstances of each case. *See In re Cooper*, 22 B.R. 718 (Bankr.E.D.Pa.1982); H.Rep.No. 595, 95th Cong., 1st Sess. 343–4 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. The weight of authority, and in our view the better reasoned opinions, hold that adequate protection relates to maintaining the status-quo during the period after the filing of the petition and before confirmation or rejection of the plan.[8] *See In re Sun Valley Ranches, Inc.*, 38 B.R. 595, 597 (Bankr.D.Idaho 1984); *In re Cooley*, 37 B.R. 590, 592 (Bankr.E.D.Pa.1984); *In re Burlington Tennis Assoc.*, 34 B.R. 839 (Bankr.D.Vt. 1983); *In re Shriver, supra; In re Cantrup*, 32 B.R. 1004 (Bankr.D.Colo.1983); *In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bankr.S.D.N.Y.1982); *In re Alyucan Interstate Corp.*, 12 B.R. 803 (Bankr.D.Utah 1981). The secured creditor is entitled to protection against any depreciation or diminution in the value of the collateral as it existed and was available to satisfy the debt on the date of the filing of the petition in bankruptcy. *See Aegean Fare, Inc. v. Mass. Dept. of Revenue (In re Aegean Fare, Inc.)*, 34 B.R. 965 (Bankr.D. Mass.1983); *Asquino v. Palmer River Realty, Inc. (In re Palmer River Realty, Inc.)*, 26 B.R. 138 (Bankr.D.R.I.1983); *In re Alyucan Interstate Corp., supra.*

While an equity cushion is generally considered prima facie evidence of adequate protection, the absence of an equity cushion does not establish the converse, i.e., that as a matter of law the creditor is not adequately protected. *See In re El Patio, Ltd., supra.* For example, a creditor who is undersecured on the date of filing is not entitled to relief from stay merely by showing that there is no equity in the property. *See In re Sun Valley Ranches, Inc., supra.* An (under)secured creditor's position is no worse immediately after the filing than it was just prior thereto, and the provisions for adequate protection may only protect the secured creditor from any impairment in the value of its interest that is *attributable to the stay.*

---

7. *See* Order dated April 12, 1985, approving disclosure statement.

8. *Contra Crocker Nat'l Bank v. American Mariner Industries, Inc. (In re American Mariner Industries, Inc.)*, 734 F.2d 426, 12 B.C.D. 227 (9th Cir.1984); *United Virginia Bank v. Virginia Foundry Co., Inc. (In re Virginia Foundry Co., Inc.)*, 9 B.R. 493 (W.D.Va.1981); *In re Hutton-Johnson Co., Inc.*, 6 B.R. 855 (Bankr.S.D.N.Y. 1980) (maintaining the status-quo is not sufficient if the equity cushion in the collateral is marginal or nonexistent). These courts hold that opportunity cost, or interest on the value of money, should be included within the definition of adequate protection. We do not agree. It is our opinion that the same protection necessary to insure the creditor the benefit of his bargain upon confirmation of a plan should not be imposed for *interim* adequate protection during the stay. *See In re Alyucan Interstate Corp.*, 12 B.R. 803 (Bankr.D.Utah 1981).

*See Alyucan Interstate Corp., supra.* The concept of adequate protection was not designed or intended to place an undersecured or minimally secured creditor in a better post-filing position than it was in before the stay. *See In re El Patio, Ltd., supra* at 523.

Since it appears that the value of the collateral securing HUD's debt is substantially the same today as it was on the October 12, 1983 filing date, (there is no evidence of a decline in the value of the property, *see In re Sun Valley Ranches, Inc., supra,*—in fact, all the evidence is to the contrary), HUD's position is substantially the same now as it was just prior to the petition. The property is currently being operated, reasonably maintained, and insured, and it has been represented by debtor's counsel that new investors are willing to participate in the reorganization. The facility has an indoor pool, health club, and cocktail lounge, which are not common in most other major apartment building facilities in Rhode Island, and which are desirable amenities in condominium complexes. Even HUD's evidence supports the finding that the property is not depreciating. When asked by the Court if a more recently conducted appraisal would change his April 1983 valuation, HUD's appraiser replied that in his opinion there would be no change in valuation. Based on all of the evidence, we conclude that the value of the collateral is not declining.

Even if the market value of the property remains constant, however, the failure to receive regular payments will shortly erode the mortgagee's delicate secured position. HUD makes this argument with respect to its interest in the collateral, and we must agree. Based on HUD's records of the debtor's mortgage accounts (HUD's Exhibit No. 11), and notwithstanding certain discrepancies which make it difficult to ascertain an exact amount attributable to post-petition delinquencies, as of June 30, 1984 the debtor was at least five months in default on post-petition mortgage and tax payments. At this stage, where the equity cushion is marginal, at best, regular payments are essential to maintain the status-quo. *See In re Shriver, supra,* at 182; *In re El Patio, Ltd., supra. See also* 11 U.S.C. § 361(1), providing that adequate protection may be satisfied by "requiring the trustee [or the debtor-in-possession] to make periodic cash payments to such entity, to the extent that the stay under section 362 of this title ... results in a decrease in the value of such entity's interest in such property." Accordingly, to insure that HUD's interest in the collateral is not diminished during any continuation of the stay, and to correct any deterioration in HUD's position which may have occurred while the stay has been in effect, denial of the relief HUD seeks will be conditioned as follows:

(1) The debtor is to resume forthwith, and to maintain all regular payments under the terms of the mortgage, including principal, interest, taxes, and insurance.

(2) The debtor shall, within six months, cure the post-petition default by making pro-rated payments to commence on May 1, 1985, payable thereafter no later than the 1st day of each month, with interest at the prevailing market rate of 11½%. *See In re El Patio, Ltd., supra.*

(3) Compliance with these requirements is to commence immediately, and it is expressly not intended that any part of this order should be stayed pending the outcome of the hearing on confirmation.

(4) The confirmation hearing shall be held on May 29, 1985, at 10:00 A.M.

Enter judgment accordingly.