In re Hosea D. CLEMMONS and Coleta Ann Clemmons, Debtors.

OZARK PRODUCTION CREDIT ASSOCIATION, Plaintiff,

v.

FIRST NATIONAL BANK OF CARROLLTON and Hosea Delos Clemmons and Coleta Ann Clemmons, Defendants.

Bankruptcy No. 82–02048–S–11.
Adv. No. 82–2166–S–11.

United States Bankruptcy Court,
W.D. Missouri, S.D.

Jan. 11, 1984.
On Motion For Reconsideration
April 12, 1984.

Gary A. Love, Springfield, Mo., for debtors.

Harold F. Glass, Springfield, Mo., for Production Credit Ass'n.

W. Anthony Feiock, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., for First Nat. Bank of Carrollton.

## MEMORANDUM OPINION AND ORDER

JOEL PELOFSKY, Bankruptcy Judge.

Debtors are dairy farmers. Ozark Production Credit Association, hereinafter PCA, holds a security interest in some cattle. In early June of 1982, debtors obtained 200 dairy cattle, entering into what are denominated Cow Lease Agreements. First National Bank of Carrolton, hereinafter the Bank, claims an interest of some sort in the cattle subject to the lease. In early July of 1982, debtors filed for relief under Chapter 11 of the Bankruptcy Code. No plan of reorganization has been proposed.

PCA filed a Complaint against debtors and the Bank for a determination of lien priorities, to enjoin the use of cash collateral and for lift of the stay. PCA also filed a Motion to Dismiss. The Bank filed a Motion to Compel Assumption or Rejection of the Leases. Hearings were held on the various complaints and motions. Debtors appeared in person and by attorney. The creditors appeared by counsel and representatives. Evidence was heard and the matter taken under advisement. The parties have filed briefs.

### I

Debtors assert that the cow leases are not true leases but security agreements and the Bank is not a creditor holding a perfected security interest. The evidence shows that the lease transaction occurred under somewhat unusual circumstances.

Cow lease 104 was executed on June 1, 1982 between Nu-Way Acceptance Corp. as lessor and debtors as lessee. On the same day Nu-Way wrote a check to Valley View Farmers for $105,000. The evidence shows that this check paid for the 105 cattle furnished under the June 1, 1982 lease. On June 7, 1982, lease 104 was assigned to the Bank.

Cow lease 105 was executed on June 3, 1982 between Nu-Way as lessor and debtors as lessee. On the same day Nu-Way wrote a check to Davis Bros. Dairy for $95,000. The evidence shows that this check paid for the 95 cattle furnished under the June 3, 1982 lease. On June 7, 1982, lease 105 was assigned to the Bank.

On June 5, 1982 the Bank filed a financing statement with the Dallas County Recorder of Deeds. The financing statement was filed with the Secretary of State on June 7, 1982. Hosea and Coleta Clemmons were shown as debtors and First National Bank was listed as the secured party. The statement covered "Two cow lease agreements covering –200– Holstein cows including cows, offspring and dairy products". What appear to be the signatures of the debtors appears in the lower left hand part of the financing statement.

The evidence shows that the Bank advanced the funds to purchase the cattle before the leases were assigned to it. There is even some suggestion in the testimony that the funds were advanced even before the leases were signed. Certainly the financing statements were prepared and the local one filed before the assignments were made. But a "financing statement may be filed before a security agreement is made or a security interest otherwise attaches". Section 400.9–402, R.S.Mo. 1969. The fact, therefore, that the financing statement was filed prior to the assignment being executed is of no significance.

Under Missouri law "an absolute assignment of an entire right or interest works a divestiture of all right of interest of the assignor" ... [and] a conditional assignment made as collateral security for a debt does not work a divestiture of all right or interest of the assignor ..." *C & M Devel-*

*opers, Inc. v. Berbiglia,* 585 S.W.2d 176, 181 (Mo.App.1979). The assignments appear to be absolute. The debtors had notice of those assignments, witness their execution of the financing statements naming the Bank and not Nu-Way as the party having an interest in the cattle.

Having notice the debtors are obligated to pay the assignee on the lease obligations. Even without notice, they could not avoid their duty to pay. They might only have a defense to payments received by the wrong party. *Citizens & Southern National Bank v. Bruce,* 420 F.Supp. 795 (D.C.E.D.MO. 1976). Debtors may not challenge, therefore, the validity of the assignment as they are obligated to pay someone and had knowledge of the Bank's interest.

The leases, which are on identical forms and vary only as to various items of information particular to the respective transactions, give debtors an option to purchase the leased cattle. Under lease 104 the option may be exercised if "said lease is not in then [sic] in default under the terms of said lease, and upon the following terms and conditions".

The next paragraph of the option agreement sets out the following terms:

"The sum of Ten Thousand Six Hundred Twenty-Six Dollars ($10,626.00) received for said leased property shall be credited toward the purchase of said leased property, plus an amount equal to the rentals then unpaid under the terms of said lease all payable in cash, plus applicable taxes, if any on the above sum".

The lease document shows that the option sum consisted of the initial payment called for in the lease ($5,250) and an additional sum of $5,376 payable on or before May 31, 1986. The lease is for 48 months beginning June 1, 1982 and terminating May 31, 1986. The first rent payment is $5,250 and, beginning in July 1982, the sum of $4,830 monthly. It is, therefore, unclear whether the amount set out in the option agreement is a price to be paid in addition to rent or a combination of a special payment and rent. It appears to be the latter. The ambiguity, however, need not be resolved.

The question of whether a transaction is a lease or a conditional sale is a matter of Missouri law. Section 400.1–201(37), R.S. Mo.1969, provides in part that:

"Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security".

"The real character of the instrument is not determined from its technical form, but from the intention of the parties as gathered from the four corners of the contract ... A test usually applied ... is whether or not such instrument requires or permits the transferee to return the property in lieu of paying the purchase price". *Kolb v. Golden Rule Baking Co.,* 9 S.W.2d 840, 842 (Mo.App.1928); *Commercial Credit Equipment Corp. v. Colley,* 542 S.W.2d 329 (Mo. App.1976).

In these agreements title is reserved in the lessor but gives lessee the right to keep progeny. The agreements also provide that rent is not "abated or reduced for any reason whatsoever" including death. Thus, the entire herd could be destroyed but the lease would not terminate. Lessee is obligated to replace deceased cattle "at no cost to Lessor". There is no express provision in the lease requiring return of the cattle to lessor upon termination of the lease.

The evidence shows that the cattle were purchased for about $1,000 each. There is no evidence as to the age of the cattle so that their condition at the termination of the term cannot be evaluated precisely. But the evidence shows, and the Court knows from the many dairy farmer cases pending in this judicial district, that these are high priced dairy cattle. In addition because of the breeding program the herd should number at least 300 head when the

term expires. The original 200 head can be purchased for as little as $53 a head or at most $106 a head under lease 104. Obviously the cost per head of the herd, including calves, will be significantly less. The costs of purchase under lease 105 are comparable.

The Court finds that the agreements are not true leases but are security agreements. The option prices are nominal. Under any circumstances, the per head value of the herd at the end of the term will be substantially higher than the option price. The fact of the assignment also supports this conclusion. The Bank is not a lessor of cattle although it, rather than Nu-Way, took the security interest in the cattle. Also, the lease payments do not abate if the property is destroyed and lessee rather than lessor is obligated to provide replacements. Upon default lessee is obligated to pay any deficiency. All of these provisions support the conclusion that these agreements are not leases but are security agreements. *In re Crown Cartridge Corporation,* 220 F.Supp. 914 (D.C.S.D.N.Y.1962); *In re Wheatland Electric Products Co.,* 237 F.Supp. 820 (D.C.W.D.Pa.1964).

### II

In addition to debts owed PCA and the Bank, debtors owe Federal Land Bank and Farmers Home Administration. These creditors have filed Motions to Dismiss contending that there is no reasonable likelihood of reorganization. Debtors oppose the Motions saying that production from the larger herd will generate sufficient sums of money to fund the plan.

The evidence shows that the herd is in good condition and that the prior problems of disease are now pretty well under control. The evidence also shows that production is about 11,000 pounds of milk per animal per year. Debtors say that some of the leased animals are not producing and should be culled. They contend that these animals are not as represented when the leases were made. They also contend that there is sufficient equity in the land to protect adequately all of the creditors and that they should be given an opportunity to demonstrate an ability to reorganize.

The evidence and the schedules show the following secured debt service:

1. Federal Land Bank: $13,628.78 semi-annual payments. Accrued interest not included.

2. Farmers Home Administration: $12,468.00 annual payment. Accrued interest not included.

3. Farmers Home Administration: $3,870.00 annual payment. Accrued interest not included.

4. Mid-Am: $529.00 per month Accrued interest not included.

5. PCA: The entire balance is due. Interest alone is $2,859.00 per month.

The payments under the leases assigned to the Bank were $9,200.00 per month over four (4) years. Amortizing the principal figure of $200,000 over six years at 12% would require a monthly payment of $3,910.04. Six years is chosen as this is a purchase money security interest, tied to the animals purchased and the evidence shows that cows produce over an 8 year span. The cows were already producing when leased so a conservative estimate of their useful life is 6 years. Twelve percent is chosen as present prime.

Debtors monthly debt service looks about like the following:

| | |
|---|---:|
| Federal Land Bank | $2,250 |
| FmHA | 1,040 |
| FmHA | 320 |
| Mid-Am | 529 |
| PCA interest | 2,859 |
| amortized over 20 years | 3,689 |
| Bank of Carrollton | 3,910 |
| Total | $14,597 |

As part of their evidence debtors introduced a projection of income and expenses beginning March of 1983. That projection is as follows:

| Month | Pounds Per month [1] | X.12 (Est. Milk Price) | Gr. profit after feed cost | Gross w/add 50 dairy animals | Gross profit w/add. animals [2] |
|---|---|---|---|---|---|
| March 1983 | 181,382 | $21,766 | $ 8,706 | $30,136 | $12,054 |
| April 1983 | 148,380 | 17,806 | 7,122 | 26,176 | 10,470 |
| May 1983 | 156,985 | 18,838 | 7,532 | 27,208 | 10,883 |
| June 1983 | 150,539 | 18,065 | 7,226 | 26,435 | 10,574 |
| July 1983 | 160,984 | 19,318 | 7,727 | 27,688 | 11,075 |
| August 1983 | 303,641 | 36,437 | 18,218 | 44,807 | 22,403 |
| Sept. 1983 | 213,472 | 25,617 | 12,808 | 33,987 | 16,993 |
| Oct. 1983 | 247,586 | 29,710 | 14,855 | 38,080 | 19,040 |
| Nov. 1983 | 233,712 | 28,045 | 14,022 | 36,415 | 18,207 |
| Dec. 1983 | 225,030 | 27,004 | 13,502 | 35,374 | 17,687 |
| Jan. 1984 | 206,075 | 24,729 | 12,365 | 33,099 | 16,550 |
| Feb. 1984 | 178,485 | 21,418 | 10,709 | 29,788 | 14,894 |
| March 1984 | 172,828 | 20,739 | 10,369 | 29,109 | 14,554 |
| April 1984 | 183,646 | 22,038 | 11,019 | 30,408 | 15,204 |

1 — Per extensive projection based on existing lactation cycles and best estimate of continued lactation through next year.

2 — This assumes 50 additional animals being placed in the herd with an average production of 45 pounds a day and milk selling at $.12 per pound. The computation is 45 pounds per day times 31 days times .12 times 50 animals for a total of $8,370.00 per month.

The primary variable in dairy production is feed cost. This is set forth above. It is estimated that the balance of the operation of the farm should remain constant at approximately $5,000 per month. The net amount available for debt repayment may be figured by taking the last column and reducing it by $5,000.00 on a monthly basis.

---

Taking the deduction set out in note 2 of the projection from gross profit (column 4), there is only one month (August 1983) when the net approaches the amount needed for debt service and even then it is insufficient. Making the same computation in column 6 produces the same result. Based upon their own projections debtors cannot pay debt service.

The reality is worse. Debtors' monthly operating reports show substantial variances from the projections. While some reports show income in excess of projections, they also show expenses equal to or in excess of income. In addition feed costs consume almost two-thirds of the gross each month. What the following chart shows is that there is no income available for debt service.

| Month | Projected Income | Actual Income | Expenses |
|---|---|---|---|
| March 1983 | $21,766 | $24,500 | $25,998 |
| April 1983 | 17,806 | 24,640 | 23,970 |
| May 1983 | 18,838 | 22,660 | 21,376 |
| June 1983 | 18,065 | 20,258 | 21,756 |
| July 1983 | 19,318 | 19,330 | 18,728 |
| August 1983 | 36,437 | 21,975 | 22,065 |
| Sept. 1983 | 25,617 | 19,203 | 19,655 |
| Oct. 1983 | 29,710 | 17,265 | 17,255 |
| Nov. 1983 | 28,045 | 20,310 | 19,743 |

The evidence shows that milk production is not high enough, on a per animal basis. The addition of more animals, as debtors suggest, is not the answer. The evidence shows that production assumptions are not correct and that the expense projections after feed costs, are not correct. Before debt service debtors' day to day costs use all available cash.

Under Section 1112 of the Code, Title 11, U.S.C., the Court may dismiss "on request of a party in interest, after notice and a hearing, . . . for cause, including—

"(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

"(2) inability to effectuate a plan . . ."

■ A Debtor must be given a reasonable opportunity to demonstrate his ability to reorganize. *In re Heatron,* 6 B.R. 493 (Bkrtcy.W.D.Mo.1980); *In re American Mariner Industries, Inc.,* 10 B.R. 711 (Bkrtcy.C.D.Cal.1981). But after that reasonable opportunity has been given, and the evidence shows that rehabilitation is not feasible, the case should be converted or dismissed. *In re L.S. Good & Co.,* 8 B.R. 310 (Bkrtcy.N.D.W.Va.1980); *In re Larmar Estates, Inc.,* 6 B.R. 933 (Bkrtcy.W.D.N.Y. 1980); *In re Tracey Service Co., Inc.,* 17 B.R. 405 (Bkrtcy.E.D.Pa.1982). This case has been pending 18 months. There is no evidence of an ability to reorganize. Because debtors are farmers the Court cannot order conversion, Section 1112(c) of the Code, but will order dismissal if debtors do not convert. The Court finds that there is no reasonable likelihood of rehabilitation here.

Debtors are granted to January 30, 1984 to convert this case to Chapter 7. In the absence of such conversion, the Court will enter an Order dismissing. On or before January 23, 1984 PCA and Bank of Carrollton are to inspect the cattle and identify those subject to their respective security agreements. The Court holds that the Bank has a perfected security interest in the animals covered by the lease but not as to progeny because the purchase money security interest is a narrow exception to the "first to file" rule, which priority is held by PCA. *In re Ingram,* 11 UCC Reptng. Service 605 (5th Cir.1972); *Index Store Fixtures Co. v. Farmers Trust Co.,* 536 S.W.2d 902 (Mo.App.1976).

The Court reserves ruling on the question of disposition of the insurance proceeds.

## ON MOTION FOR RECONSIDERATION

In its Order of January 11, 1984, the Court held that debtors failed to show that they could reorganize based upon existing debt service obligations and funds from operations. The Court granted debtors thirty (30) days to convert or be dismissed. Debtors chose to file a Motion for Reconsideration urging a new proposal which would make reorganization feasible. First National Bank of Carrollton also moved for reconsideration.

A hearing was held on the Motion. The parties appeared in person, by counsel and representatives. Evidence was heard and the matter taken under advisement.

### I

■ In its previous Order the Court had held that the relationship between First National Bank and debtors was a security agreement and not a true lease. The Bank asked for reconsideration of that part of the Order holding that the purchase money security interest did not reach progeny, contending that many of the purchased cattle were pregnant and that those progeny were subject to its security interest rather than to PCA's security interest as created by the after-acquired clause of its security agreement.

Section 400.9–204, R.S.Mo.1969, provides, in part, that

"(1) A security interest cannot attach until there is agreement . . . that it attach and value is given and the debtor has rights in the collateral.

"(2) For the purposes of this section the debtor has no rights

(a) . . . in the young livestock until they are conceived; . . ."

Thus Clemmons had a right at the time of the purchase to give a security interest in unborn but conceived progeny. If cows were pregnant when debtors took possession the Bank could have a security interest in those unborn young. Under Section 400.-9–312(4), R.S.Mo.1969, that purchase money security interest prevails over the after-acquired interest.

"A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within ten days thereafter".

The security interest was perfected when debtor took possession of the cattle. In the hands of the dairy farmer the cattle are not inventory. Compare *In re Smith*, 29 B.R. 690 (Bkrtcy.W.D.Mo.1983). See also *Ingram v. Ozark Production Credit Association*, 468 F.2d 564 (5th Cir.1972).

. The lease in paragraph 2 provides that it covers "ninety-five cows, more particularly described in the schedule marked 'A' hereof . . . and any and all offspring, progeny and replacements thereof. Said cows together with all female offspring, progeny and replacements are collectively referred to as 'Cows' and all references to 'Cows' shall be deemed to include the offspring, progeny and replacements unless the text otherwise precludes such inclusion".

Under paragraph 3 of the lease Lessee is "entitled to retain . . . all female progeny" and "proceeds from the unauthorized sale of females shall be remitted to Lessor". Paragraph 12 of the lease requires Lessee to retain proceeds from the sale of Cows for the benefit of Lessor. Paragraph 13 deals with default and permits Lessor to "take possession of the Cows listed on the attached Schedule 'A'". In the event of "premature termination" of the lease, Lessee is obligated to deliver "the Cows then on hand". On its financing statement filing, the Bank listed a security interest in cattle, progeny and proceeds.

The lease expresses a clear intention that the Lessor will retain an interest in mature cows and female progeny. The language of paragraph 13 is not consistent with that retention but the discrepancy is covered in the paragraph covering premature termination. This Court's conclusion that the lease is in reality a security agreement also curtails the breadth of that interest. But the Court notes that the document was not drafted as a security agreement and that some inconsistencies might be expected. The Court holds, therefore, that the Bank had a security interest in conceived progeny of the herd, and that, upon default, it could repossess the cows identified in Schedule A and progeny or proceeds of female calves sold belonging to that group of animals which could be described as first generation calves. Calves not conceived as of the dates of the leases or proceeds of the sale of second generation calves are subject to the claim of PCA, the after-acquired secured creditor.

## II

■ Debtors contend that their revised reorganization is feasible. The evidence shows that debtors have sold some cattle and have placed the proceeds in escrow pending further Order of the Court. Debtors propose to use the escrow funds together with the proceeds of sale of cull cattle to buy a better quality herd. Debtors also propose to enroll in the dairy PIK program and use those funds to purchase additional cattle. By April of 1985 they plan to own 348 mature animals which they propose to cull to 300 and use some of those proceeds for debt service. Except for nominal amounts, no debt service would be paid until April of 1985, when milk production would stabilize and finally generate sufficient money to fund the reorganization. PCA and the Bank contend that these are rose-colored projections and that the proposal is not feasible.

The key to debtors' proposal is a herd of 300 animals will maintain and produce a rolling herd average of 40 pounds. The evidence shows that the average in Dallas County, Missouri, where debtors' farm is located, is about 35 pounds. When debtors purchased the herd funded by the Bank, the animals were represented to be of high quality with high production capability, but they have been a dismal failure. Debtors' rolling herd average at the time of the hearing was only about 24 pounds, due in large part to the high percentage of non-producing cows. When production was evaluated in terms of a normal amount of

dry cows, the average rose to as much as 38.3 pounds but only for one month.

Milk production is an incredibly complicated task. Weather, the amount and nature of the feed and even the person handling the animal can make a difference. Disease is also a factor. A cow producing a certain amount of milk in Wisconsin will probably not produce the same amount in Missouri. A cow added to a herd will take months to adjust, to arrive at full production capability. At any given time, about 15% of the herd is not producing. There is constant pressure to drive milk support prices down. The cost of feed fluctuates constantly. The PIK wheat program, for example, makes the cost of grain more expensive to the dairy farmer at the same time that milk prices are going down. Feed costs range from 45 to 60% of the cost of a Dairy operation. Translated into production, that means that a cow must produce 25 pounds of milk per day simply to justify her feed.

In a 300 cow herd, 255 cows can be on line at one time. At 40 pounds, this results in gross milk production worth $38,556; at 35 pounds, gross monthly income would be $33,700. Debtors estimate a monthly cash flow of $32,000. In April of 1985, debtors will have the following secured debts, assuming their proposal is adopted:

| | |
|---|---|
| Land Bank | $ 330,316.11 |
| PCA | 393,835.00 |
| Bank of Carrollton | 85,000.00 |
| FmHA | 200,000.00 |
| Various | 50,000.00 |
| Total | $ 1,059,151.11 |

This debt, amortized over 20 years at 12%, admittedly rough figures, requires monthly debt service of approximately $11,-550. Over 40 years, the monthly payment would be $10,504. The actual debt service would be slightly higher than the 20 year amortization because not all of the debt can be stretched over 40 years and because the interest rates are variable.

The income and expense projections based upon various assumptions set out are as follows:

(1) Forty pound average, $5,000 per month operating expenses:

| Feed costs 50% | Feed costs 60% |
|---|---|
| $38,556 | $38,556 |
| 19,278 | 23,133 |
| 19,278 | 15,423 |
| 5,000 | 5,000 |
| $14,278 for debt service | $10,423 for debt service |

(2) Thirty-five pound average, $5,000 per month operating expenses:

| Feed costs 50% | Feed costs 60% |
|---|---|
| $33,700 | $33,700 |
| 16,850 | 20,200 |
| 16,850 | 12,480 |
| 5,000 | 5,000 |
| $11,850 for debt service | $ 7,480 for debt service |

While debtors maintain that monthly expenses are less than $5,000, the experience reflects the contrary. Even if those expenses were less, they could not be substantially so, as the category includes utility costs, ordinary living expenses, insurance, repairs and employees. The monthly report for February reflects expenses excluding feed at over $4,600 involving a herd of less than 200 animals. Milk production was $14,800 and feed costs were $9,400. Of course this reflects a substantial number of non-producing cattle which have to be fed but certainly suggests that feed costs of 50% would be difficult to attain.

This case pends on PCA's Motion for Lift of the Stay and/or the Motions of PCA and FmHA to Dismiss. The bank asked for possession of its collateral and for other appropriate relief. To deny a creditor relief from the stay the Court must find that debtors have equity in the property or that the property is necessary for reorganization and that reorganization is feasible. Section 362(d) of the Code. *Matter of Terra Mar Associates,* 3 B.R. 462 (Bkrtcy.Conn.1980); *In re Besler,* 19 B.R. 879 (Bkrtcy.S.D.1982).

The long history of this case shows that debtors have not generated sufficient funds to pay their secured debt. This proposal suffers from the same defect. Except under the most optimistic analyses, debtors' operation cannot service the debt. The Court is not persuaded that debtor can

maintain production at a rolling herd average of 40 pounds with only 50% feed costs. They have not done so in the past. Such production levels can only be maintained on a high calorie diet, which contemplates high feed costs. In addition, there is no leeway in the calculations to deal with drought, disease or any unforeseen negative influences. Nor is 35 pounds of production with 50% feed costs persuasive. That analyses shows just enough money for debt service but only at a fixed rate of interest. Any increase in rate or shift of cost results in a shortfall.

The Court finds that the proposals are not feasible. Debtors are granted to May 4, 1984, to convert, dismiss or make arrangements with creditors to submit a plan which may be confirmed. Absent such action the Court will modify the stay to allow creditors to take possession of their collateral.