## In re WESTERN PREFERRED CORPORATION, Debtor.

**Bankruptcy No. 485–41134.**

United States Bankruptcy Court,
N.D. Texas,
Fort Worth Division.

Dec. 6, 1985.

Stephen F. Gordon, McCabe/Gordon, P.C., Boston, Mass., Paul B. Geilich, Creel & Atwood, Dallas, Tex., for debtor, Western Preferred Corp.

Daniel C. Stewart, Winstead, McGuire, Sechrest & Minick, Dallas, Tex., for Bank Group.

## MEMORANDUM OF DECISION AND ORDER

MICHAEL A. McCONNELL, Bankruptcy Judge.

On November 11, 1985, the Motion to Terminate Automatic Stay and Demand for Adequate Protection previously filed on September 4, 1985 by MBank Dallas, N.A. (f/k/a/ Mercantile National Bank at Dallas), The First National Bank of Boston, Manufacturers Hanover Trust Company, Wells Fargo Bank, N.A. and Bankers Trust

Company (the "Banks") came on for trial before the Court.

Following two and one-half days of testimony, both sides rested and the Court then requested the parties to submit post-trial briefs and proposed findings of fact and conclusions of law no later than November 22, 1985. All post-trial requirements having been accomplished, the Court now enters the following Findings of Fact and Conclusions of Law pursuant to Rules 7052 and 9014 of the Bankruptcy Rules:

## FINDINGS OF FACT

### I. *Introduction*

1. The parties called the following witnesses:

a. *The Banks*

(1) Fredrick H. Gunther—Chairman of the Board and President of Western Preferred

(2) Stephen N. Shapu—Vice President of Western Preferred

(3) Donald R. Cooper—Principal of Banks' actuarial consultant Resource Deployment, Inc. ("RDI")

(4) Douglas M. Geuder—employee of Banks' actuarial consultant Milliman & Robertson, Inc.

(5) Lawrence R. Durbin—Senior Vice President of Western Preferred

b. *Western Preferred*

(1) Daniel Ellis—Principal of Western Preferred's actuarial consultant, Lewis & Ellis, Inc.

(2) Rodney Hawes—Principal of Western Preferred's insurance company brokerage firm, Insurance Investment Associates

(3) Thomas Brown—Certified Public Accountant and member of Western Preferred's accounting firm, Peat, Marwick, Mitchell & Company

(4) Quincy McPherson—Chairman, Asset Management Group I, MBank Dallas, N.A.[1]

2. The Stipulated Facts contained in the Pre-Trial Order are incorporated herein by reference and are accepted for all purposes by the Court.

3. Western Preferred Corporation, the Debtor herein ("the Debtor" or "the Company"), is a holding company incorporated under the laws of the State of Texas whose wholly-owned subsidiaries issue and market life, group, and accident and health insurance as well as annuity contracts. All of Western Preferred's significant business operations are conducted by its subsidiaries. The Debtor has no income, no employees on its payroll, no receipts and no disbursements on an on-going basis.

4. The parties stipulated in the Pre-Trial Order that Western Preferred executed and delivered to the Banks promissory notes and a Security (Pledge) Agreement dated as of July 29, 1982, which was amended from time to time (the "Credit Agreement"). The Credit Agreement provided for the extension to Western Preferred of term and revolving credit and letters of credit. This credit facility was secured by pledges of capital stock, debentures and notes held by Western Preferred issued primarily by certain affiliates and subsidiaries of Western Preferred ("the Collateral"). MBank Dallas, N.A. ("MBank") is the lead or agent bank for a syndicate of five banks on these loans.

5. The indebtedness owed by the Company to the Banks exceeded $105 million as of the date of the Order for Relief (August 13, 1985), and is evidenced by the promissory notes described in Stipulations of Fact Nos. 9–24 contained in the Pre-Trial Order ("the Indebtedness"). The Debtor has been in default with respect to the Indebtedness since prior to the commencement of this bankruptcy proceeding, and the Indebtedness continues to accrue interest at the rate of approximately $35,000.00 per day.

6. The primary value in the Collateral is in the stock of World Service Life Insurance Company ("Top Tier World") which no longer issues insurance, but has a "closed

---

**1.** In addition to the oral testimony, thirty-three exhibits were admitted into evidence for the Debtor and sixty-eight exhibits were admitted for the Banks.

block" of life insurance in force. Top Tier World is the parent of World Service Life Insurance Company of Colorado ("Second Tier World"), which issues a relatively small amount of group and credit insurance (short term life and health and accident insurance). Second Tier World is the parent of United Fidelity Life Insurance Company, ("United Fidelity") which formerly issued life insurance policies. The stock of Top Tier World, including the value of its wholly-owned subsidiaries (Second Tier World and United Fidelity) constitutes at least 95% of the total value of the assets of the Debtor.

7. Top Tier World and Second Tier World are subject to Orders of Supervision issued by the Colorado Commissioner of Insurance. United Fidelity is subject to an Order of Suprevision issued by the Texas Commissioner of Insurance.

## II. Management Prior to 1985

8. Between the time of the execution of the Credit Agreement and December, 1984, Western Preferred was under the leadership of Mr. F. Larry Tunnell. Fredrick H. Gunther and Lawrence R. Durbin were also members of senior management during this period.

9. Mr. Tunnell seriously mismanaged Western Preferred's, and its subsidiaries', operations. The inefficiency of his management required him to enter into "surplus relief treaties" to remedy the surplus drain.

10. Mr. Tunnell expanded Western Preferred's holdings by paying inflated prices for certain insurance companies. For example, under Mr. Tunnell's management, the Banks loaned Western Preferred funds to purchase National Savings Life Insurance Company ("NSL") for $24 million. NSL had never earned more than $2 million annually. The Banks also loaned Western Preferred, at 14% interest, the money to finance the purchase of United Fidelity Life Insurance ("United Fidelity") for $70 million. United Fidelity had never earned more than $2 million annually.

11. Profits were taken from Western Preferred's healthy life insurance subsidiaries and poured into failing casualty insurance subsidiaries. The casualty companies are now in receivership in the states of their incorporation. Management of the Debtor also purchased the 2.5 jet aircraft that various witnesses referred to as the "air force" and, in 1982, obligated the subsidiaries on a lease of premium office space that runs until June, 1987, requiring the subsidiaries to pay premium rent.

12. During Mr. Tunnell's management, the Banks determined that their loan to Western Preferred was troubled and put it into supervised status at least as early as May 30, 1984.

13. In December, 1984, Western Preferred's Board of Directors met and removed Mr. Tunnell from all management responsibilities. His administration was replaced by Gunther and Durbin. As a result of Mr. Tunnell's management practices, Western Preferred brought suit against Mr. Tunnell and other previous managers on March 29, 1985 in the United States District Court for the Northern District of Texas, Fort Worth Division.

## III. Transition of Management

14. Upon taking control of the company, Gunther and Durbin analyzed the financial condition of its subsidiaries. They recognized that the casualty companies had sustained operating losses of $40,000,000, and, thereupon, attempted to stop the flow of funds.

15. Mr. McPherson, whom MBank hired as a consultant at about the same time management changed, insisted that the parties develop a repayment plan. The new management began developing such a plan. In addition, the Company began working with Mr. Ellis, its consulting actuary for the previous several years, for the specific purpose of determining how to reduce expenses and develop a reasonable budget that would reflect continuing expense reductions.

## IV. Repayment Plan Proposed by Banks and RDI in Early 1985

16. In February, 1985, the Banks hired Mr. John Sharpe and Mr. Donald Cooper of

Resource Deployment, Inc., ("RDI"), to aid in the resolution of the problems with their loan to Western Preferred.

17. In February, 1985, RDI devised a plan, which it then proposed to the Banks, to accomplish repayment of Western Preferred's debt.

18. The basic outline of RDI's proposed repayment plan was a debt-asset swap, giving the Banks Top Tier World's ordinary life business and leaving Second Tier World's group and credit insurance business to Western Preferred. Under the repayment plan, Western Preferred would have retained the current overhead expenses. The Banks would employ RDI to manage the life insurance business in Top Tier World. RDI would have received a fixed fee per policy held by Top Tier World —$12.50 per paid-up policy and $25 per premium-paying policy—plus 10% of the profits. The Banks and RDI contemplated RDI eventually owning Top Tier World's business and servicing the Bank's debt.

19. Among the terms of the repayment plan were provisions requiring the sale of certain of Western Preferred's subsidiaries. (Debtors Exhibit 10) The Banks, through Mr. McPherson contacted Mr. Rodney Hawes of Insurance Investment Associates, an insurance company brokerage firm, in February, 1985 to assist in accomplishing these sales.

20. Pursuant to the above-described plan, and with the Banks' approval and Mr. Hawes' assistance, Western Preferred sold its interest in three of its subsidiaries: (1) NSL on June 12, 1985—yielding $21 million, less commission, which was paid directly to the Banks, (2) American Insurance Company of Texas on June 30, 1985, and (3) Founders Financial Corporation on August 13, 1985.

21. Also pursuant to the repayment plan, Western Preferred began negotiations in early 1985 to sell United Fidelity to John Alden Life Insurance Company ("Alden"). Alden wanted to purchase not only United Fidelity's insurance business in force, but the agency (sales) force as well. Accordingly, to keep United Fidelity's

agency (sales) force intact United Fidelity continued accepting new policy applications submitted by its agents and issuing new policies while the negotiations with Alden were underway.

22. The policies issued by United Fidelity pending the Alden sale cost United Fidelity considerable sums of money, approximating $1 million each month. The cost to investigate, issue and pay the commission on a life insurance policy during its first year is considerably greater than the first year's premium. In addition, to satisfy state regulatory requirements, a life insurance company must show an increase in statutory capital and surplus to cover the increased risk associated with the new policy.

23. As the negotiations with Alden continued into March, the Company became concerned about the losses from the new United Fidelity business and the resulting surplus drain. To minimize this risk and thereby alleviate the surplus drain, the Company's management asked for and received an agreement from Alden to reinsure United Fidelity for the increased cost of issuing new policies pending consummation of the sale.

24. In June of 1985, Alden broke off negotiations on the agreement to purchase United Fidelity, and apparently defaulted on the reinsurance agreement. The Company contemplates bringing a lawsuit against Alden, but it has not yet received the necessary permission from the Texas Department of Insurance.

### V. Banks' Abandonment of Repayment Plan

25. Shortly after the Alden sale collapsed, Western Preferred received three offers for the purchase of United Fidelity at net prices in the upper $30 million range, substantially below Alden's original offer. The highest offer, after adjusting for overhead costs the purchaser would not assume, was for a purchase price of $38 million.

26. At a meeting among the Banks' representatives, the Insurance Commissioners

of Colorado and Texas, and Western Preferred's new management, the Banks argued that Western Preferred should take one of the three sale offers.

27. When Western Preferred refused, the Banks responded by arguing that the commissioners should put Top Tier World into receivership with RDI to be appointed as receiver. In a Memorandum dated July 12, 1985, (Debtor's Exhibit 17), Mr. McPherson informed Insurance Commissioners Kezer and Bond, of Colorado and Texas, respectively, that:

In attempting to resolve the many issues involved with Western Preferred's situation, the Banks have reached the following conclusions: 1. United Fidelity must be sold immediately at a market price which we feel to be in the mid $40 million range ... We are not confident that such sale will be accomplished by current management ... Therefore, we respectfully request that World Service, the *parent life company, be put into receivership and that management be replaced by RDI.* The Banks are prepared to commit new resources to support the implementation of this request. (emphasis added).

28. At a meeting with the Insurance Commissioners, Mr. Gunther stated that he would not take the new offers for United Fidelity because he believed it could be sold in the mid-$50 million range. Nevertheless, the Banks and Mr. Cooper of RDI interpreted these actions to mean that new management no longer intended to continue with the repayment plan. In the July 12, 1985 memorandum from McPherson to the Insurance Commissioners, McPherson stated, "[It] is now clear that United Fidelity represents to the existing management the essential ingredient to their hopes for future expansion and growth and they are unwilling to pursue a sale at realistic prices."

29. The Banks, having considered at least as early as May, 1985 the possibility of either foreclosing on the Collateral or putting the Company through an expedited bankruptcy, began foreclosure proceedings on the Collateral in July, 1985.

30. On August 13, 1985, on the eve of foreclosure, Western Preferred filed for protection under Chapter 11 of the United States Bankruptcy Code.

VI. *Post-Petition Management*

31. After the filing of the petition, the Company was successful in entering into a Contract of Sale with Louisiana National Life Insurance Company ("Louisiana National") to sell United Fidelity. With the sale of United Fidelity, Top Tier World will absorb some increases in overhead, primarily consisting of executive salaries and executive support staff currently allocated to United Fidelity, in the total amount of $258,000. Louisiana National may assume some of these costs. Any such increased costs to Top Tier World will be offset by the following reductions in the overhead expenses borne by Top Tier World and Second Tier World:

| | |
|---|---|
| Industrial Division costs | ($220,824) |
| Tax Department costs | (30,000) |
| Leased Space allocated costs | (172,262) |
| Total Reductions | ($423,086) |

32. According to the Contract of Sale, Louisiana National will pay Second Tier World $47,000,000 for Second Tier World's stock in United Fidelity, pay over to Second Tier World aged balances as they are collected, and assume certain expense obligations, bringing the total value of the purchase price to $53 million. In addition, Louisiana National will make a $6 million tax payment to Second Tier World, a payment that the Texas Insurance Commissioner has heretofore prohibited.

33. All parties are in favor of the sale of United Fidelity to Louisiana National on the terms set forth in the present agreement.

34. The United Fidelity sale is scheduled to close no later than December 31, 1985. Mr. Gunther testified that to his knowledge there are no impediments to the closing of the sale other than the approval of the Texas Insurance Department.

35. The expenses of Western Preferred's subsidiaries during 1984 were excessive and have historically been higher than those of similar companies. For example, the cost of maintaining the life insurance business of Top Tier World was approximately $40.00 per policy.

36. With the assistance of Mr. Ellis, present management has created a projected budget for 1986. (Bank's Exhibit 37). It provides for a per policy maintenance cost of $22 per premium-paying policy and $11 per paid-up policy.

37. The expense reduction measures introduced by the new Gunther/Durbin management include the following: (1) discharging 150 employees, 122 since the commencement of this Chapter 11 case (a nearly 25% reduction) (2) all but eliminating the use of outside consultants, (3) making no new purchases of computer software, (4) severely limiting clerical overtime, (5) freezing executive salaries, (6) eliminating annual bonuses for insurance training achievements, (7) restricting telephone and copy machine usage, (8) imposing new wage guidelines that restrict support staff raises to 3% annually in place of the previous limit of 6% annually, (9) reducing employee benefits such as professional association dues and subscriptions, agents' accident and health coverage, tuition for educational seminars, and business entertainment expenses, (10) closely scrutinizing agents' profitability to adjust commissions downward where appropriate, and (11) enforcing new policies regarding use of office supplies to encourage recycling instead of repurchasing.

38. Management efforts to reduce expenses are continuing and their results will be felt increasingly during the post-petition period. For example, Louisiana National will assume United Fidelity's proportionate share, (50%) of current charges under the lease of office space. Even if that sale is not consummated, ceasing to issue new policies through United Fidelity will produce further expense reductions in the fourth quarter of the 1985 calendar year.

39. Under new management, actual cash expenditures by the subsidiaries for the first 9 months of 1985 were $3,600,000 less than for the same period in 1984. (Banks' Exhibit 36). New management accomplished this overall reduction in expenses despite the high cost, approximating $1,000,000 per month, of maintaining United Fidelity's agency (sales) force as required by Alden. In June, 1985, new management shut down the United Fidelity agency (sales) force; the resulting reduction in expenses having only recently begun to be reflected in the expense reports.

40. The overall expense reduction can be measured from the 1984 $40 per policy maintenance cost for Top Tier World. That cost has declined to the present cost of $25 per premium-paying policy and $12.50 per paid-up policy.

41. As discussed above, the 1986 Projected Budget reflects a further decrease in the per policy maintenance cost down to $22 per premium-paying policy and $11 per paid-up policy. Mr. Ellis' review of the quarterly financial statements of the Top Tier World, Second Tier World and United Fidelity for the first three quarters of 1985 shows a downward trend of expenses for those three companies.

42. Although the efforts of post-petition management to reduce expenses are certainly commendable and far reaching, the projected savings are *de minimis* when compared to the continuing accrual of interest on the Indebtedness. A review of the Debtor's own testimony with respect to the proposed budget reductions shows that it hopes, by virtue of such proposed budget reductions, to reduce the cost per policy for premium paying policies from $25 per policy to an average of $22.50 per policy and in the average cost of paid-up policies from $12.50 per policy to $11.00 per policy. *If all* of such proposed budget reductions are effected as of January 1, 1986, however, the gross reduction in per-year expenditures will only total $400,000.00. The interest accruing on the total Bank debt in the meantime approximates $35,000 per day or $12,775,000 per year.

43. Moreover, even with intensive post-petition efforts to reduce expenses, the Debtor has reported operating losses during the Chapter 11 case (August 13—September 30) of approximately $657,000.00.

## VII. *Value of Collateral*

44. Although the Debtor valued its personal property (in effect, all assets of the Debtor) at approximately $169 million in its Schedules of Assets and Liabilities, the Debtor stipulated at trial that: (1) the surplus debentures have *no value* rather than the value of $69,693,775.96 ascribed to them in the Schedules, and (2) that the stock in National Savings Corporation has a value of no more than $98,000.00, rather than the value of $18,791,342.00 ascribed to it in the Schedules. Accordingly, the Debtor has amended its Schedules to reflect that the total personal property owned by the Debtor has a present value of *not more than $65 million.*

45. The Bank presented two experts on the question of the value of the Collateral, Mr. Cooper of RDI and Mr. Geuder of Milliman and Robertson. Both testified that they relied heavily upon prior valuations completed by the actuarial firm of Lewis & Ellis, Inc., Mr. Ellis' firm. After making certain adjustments to the Lewis & Ellis valuations, it was the Banks' experts' opinion that the "actuarial value" of the collateral was in the range of $55 million—$65 million. The "actuarial value" of the subsidiaries is a function of the capital and surplus of such companies plus the present value of the finite future stream of net revenue represented by insurance premiums to be received in the future.

46. This value does not, however, immediately translate to the fair market value of the Collateral, which is the price a ready buyer would pay to a willing seller for the stock of Top Tier World. Mr. Cooper acknowledged that the $55 million actuarial value that he placed on the stock of Top Tier World might not reflect what a purchaser would pay for that stock.

47. Western Preferred's experts reinforced Mr. Cooper's testimony that actuarial values do not necessarily reflect the market price for an insurance company. Specifically, both Mr. Ellis and Mr. Hawes identified other variables that would affect the actual market price: compatibility of the buyer's business with the seller's company, the age of the policy holders in relation to the applicable mortality tables, the size and productivity of the agency force, quality of management, the specific states in which the company was licensed to do business, the value of the company's investment portfolio, and, for tax purposes, the size of any net operating loss carry forwards and any policy holder surplus accounts.

48. While the Debtor would like the Court to disregard the testimony of Mr. Cooper as to actuarial value, the evidence is clear that "actuarial values" have borne a significant relationship to ultimate sales prices of various lines of business or subsidiary companies and bear a particularly significant relationship to the proposed sales price of United Fidelity.

49. Based upon the evidence before this Court, the Court finds the "liquidation value" of the Collateral to be approximately $55 million. The "fair market value" of the Collateral is approximately $65–75 million after giving effect to the proposed sale of United Fidelity. Using either value, the Debtor has no equity in the Collateral for purposes of Section 362(d) of the Bankruptcy Code.

## VIII. *Necessity of Collateral for Effective Reorganization*

50. Western Preferred has no active business of significant value other than its subsidiaries' business. Without the Collateral, Western Preferred cannot reorganize because it will have no business or assets of any significant value.

51. Western Preferred and the subsidiaries have net operating loss carry forwards ("NOL")[2] in the total amount of

---

**2.** An "NOL" is a loss incurred by a taxpayer that may be applied to past or future years' profits to offset profits that otherwise would be taxable.

$117,990,000.00. (Debtor's Exhibit 22).[3] Western Preferred also has deferred taxes on approximately $25,000,000 of its subsidiaries' income. (Debtor's Exhibit 23)[4]. At the subsidiaries' taxable rate of 46%, this income represents approximately $11,500,000 in deferred taxes.

52. Foreclosure could cause Western Preferred to lose the value of these assets; the NOL could be destroyed if Western Preferred's continuity of business is interrupted, and the deferred taxes could be accelerated by causing a distribution or liquidation of the subsidiaries' assets. An investor in, or purchaser of, Western Preferred could, however, take advantage of both of these assets.

53. The values of the NOL and the deferred taxes are both values that exist in Western Preferred and that the Banks may not realize upon foreclosure or liquidation of the collateral.

54. It is undisputed that unsecured creditors and shareholders would receive nothing whatsoever in the event of foreclosure on the collateral by the Banks. Further, foreclosure may destroy the possibility of obtaining an infusion of outside capital as it could destroy the NOL.

IX. *Adequate Protection*

55. The Debtor filed this Chapter 11 on August 13, 1985 and as a result the automatic stay provided in Section 362 of the Bankruptcy Code came into effect. Absent the automatic stay, the Banks would have proceeded with their foreclosure on the Collateral on August 14, 1985 and would have been able to re-sell their Collateral, following foreclosure, for at least $55 million.

56. If the Collateral were sold for cash at foreclosure today, the evidence before this Court is that the Banks could realize an annual return of 10.37% on the cash proceeds.

57. From the inception of this Chapter 11 case to date, the Debtor has made no payments of any kind to the Banks in respect of principal, interest or lost investment opportunity of the proceeds they could have realized at foreclosure.

58. Top Tier World and United Fidelity have ceased issuing new policies of life insurance; as a result, no replacement of the finite future income is occurring.

59. None of the lines of business of the insurance company subsidiaries of the Debtor (except inconsequential ones) are making any "statutory profit" at this time, nor are they likely to, considering the absence of profitable business and current and projected expense levels.

## CONCLUSIONS OF LAW

### I. *The Legal Framework*

1. This Court has jurisdiction over the subject matter and the parties involved in this proceeding pursuant to 28 U.S.C. § 157. A motion to terminate, annul or modify the automatic stay is a "core proceeding" as defined in 28 U.S.C. § 157(b)(2)(G).

2. Section 362 of the Bankruptcy Code provides that the filing of a petition operates as an automatic stay against certain actions of creditors including the foreclosure of liens on real and personal property.

3. Section 362(d) provides two instances in which, upon the request of a party, the court *must grant* relief from the automatic stay. The first instance is "for cause", including the lack of adequate protection of an interest in property of such party in interest. 11 U.S.C. § 362(d)(1). The second instance concerns the stay of an act against property. 11 U.S.C. § 362(d)(2). In the second instance, the court is required to grant relief from the stay if (a) the Debtor does not have equity in the

---

**3.** Of the net operating loss carry forwards available to Top Tier World, Second Tier World and United Fidelity only approximately $7 million will remain available after the sale of United Fidelity.

**4.** Insurance companies are allowed to defer taxes on certain income. Pending taxation, the income is carried in Policyholder Surplus Accounts.

property, *and* (b) the property is not necessary to an effective reorganization. Either instance alone is sufficient to justify relief from the automatic stay. *Nazareth National Bank v. Trina-Dee, Inc.*, 731 F.2d 170 (3rd Cir.1984).

4. In determining whether or not to lift the automatic stay, one must keep its purpose in mind. The automatic stay is designed as a holding pattern for secured claims under the Code, provided there is adequate protection, until a plan of reorganization is confirmed. It is not an end in itself, but rather a tool to facilitate reorganization. Its function so far as secured creditors are concerned, is to preserve their position, *within equitable limits*, during the period between the filing of a case and the confirmation of a plan of reorganization. Should the case be dismissed, or confirmation denied, the secured claimant is entitled to adequate protection in the interim. If a plan is confirmed the secured claimant is entitled to the rights provided in 11 U.S.C. § 1129 and to the election under 11 U.S.C. § 1111(b)(2). *Provident Bank v. BBT (In Re BBT)*, 11 B.R. 224, 232 (Bankr.Nev.1981); *Central Trust Co. v. Mr. D. Realty Co. (In Re Mr. D. Realty Co.)*, 27 B.R. 359, 364 (Bankr.S.D.Ohio 1983).

## II. *Cause For Relief From Stay—Section 362(d)(2)*

### A. *Equity in the Collateral*

5. As the Indebtedness in the approximate sum of $105 million far exceeds the liquidation value found by the Court of $55 million or the fair market value of $65–75 million, the Court finds as a matter of fact and law that the Debtor does not have an equity in the Collateral. Accordingly, the Banks have met their burden of proof under Section 362(d)(2)(A).

### B. *Necessity of the Collateral to an Effective Reorganization*

6. The Court, however, further finds as a matter of fact and law that the Collateral is necessary for an effective reorganization of the Debtor. Under Section 362(d)(2)(B) of the Bankruptcy Code, the burden is on the Debtor to show that the property in question is necessary "for any possibility of reorganization." *Dallas-Fort Worth Regional Airport v. Braniff Airways*, 26 B.R. 628, 636 (Bankr.N.D.Tex.1982).

7. As the property at issue here—the capital stock of all of the Debtor's operating subsidiaries—is the Debtor's primary, and virtually exclusive, operating asset which is by definition necessary to an effective reorganization, the Collateral is absolutely critical to Western Preferred's reorganization efforts. Granting the Bank's motion to lift stay would be tantamount to approving the divestiture of all of the operating assets of the Company, thereby precluding reorganization.

8. Because the Collateral is clearly necessary for any possibility of reorganization, the Debtor has met its burden of proof under Section 362(d)(2)(B) of showing that the property is necessary to an effective reorganization. Accordingly, the Bank's Motion to Lift Stay as it relates to Section 362(d)(2) of the Bankruptcy Code must be denied in its entirety.

9. In this connection, the Court is aware of the line of cases exemplified by *Matter of Terra Mar Associates*, 3 B.R. 462 (Bankr.D.Conn.1980) which hold that the statutory requirement that the property be necessary to an effective reorganization depends upon a finding by the Court that "there is a reasonable possibility of a successful reorganization within a reasonable time." *See also, In Re Clemmons*, 37 B.R. 712 (Bankr.W.D.Mo.1984); *In Re Yanks*, 37 B.R. 394 (Bankr.S.D.Fla 1984); *In Re Shriver*, 33 B.R. 176 (Bankr.N.D.Ohio 1983).

10. Based upon the evidence before this Court, the Court specifically finds that there is a reasonable possibility of a successful reorganization with a reasonable time. The history of the party's pre-petition efforts to structure a repayment of the Bank debt indicates that there is a reasonable basis for an effective plan of reorganization.

11. Western Preferred was able to and continues to comply with certain elements

of the repayment plan previously adopted by the parties. As discussed herein,

    (a) United Fidelity is about to be sold at an advantageous price; and

    (b) Management is attempting to reduce expenses in accordance with the agreement.

12. The requirement of stockholder approval of the repayment plan, as to which the Banks expressed concern pre-petition, does not pose an insurmountable barrier to reorganization under Chapter 11. Under the Bankruptcy Code, only a statutorialy defined percentage of the class of *voting* stockholders must approve the plan. 11 U.S.C. § 1126.

13. At the present time, it appears that the Banks will have an allowed *secured claim* under § 506 of the Bankruptcy Code in the approximate sum of $55 million and an allowed *unsecured claim* in the approximate amount of $50 million. Although the unsecured deficiency claim of the Banks constitutes the overwhelming majority in amount of all unsecured claims, a plan of reorganization could be confirmed over the objections of a dissenting class of unsecured creditors if (a) it provided unsecured creditors with the value of their allowed claims, or (b) it provided nothing to junior claims and interest. *i.e.,* equity security holders. 11 U.S.C. § 1129(b)(2)(B).

14. Furthermore, if the Banks take the Section 1111(b) election to prevent a "cash-out" for $55 million under a proposed plan of reorganization, the Banks will be unable to vote their deficiency claim in the class of unsecured claims.

### III. Cause for Relief from Stay—Section 362(d)(1)

#### A. Adequate Protection

15. Section 362(d)(1) requires the Court to grant relief from the automatic stay for "cause", including a lack of "adequate protection". Although "adequate protection" is an undefined term in the Bankruptcy Code, § 361 provides that adequate protection can consist of cash payments, additional or replacement liens, or other relief as will result in the realization by such entity of the "indubitable equivalent" of such entity's interest in such property.

16. In the seminal decision of *In Re American Mariner Industries, Inc.,* 734 F.2d 426 (9th Cir.1984), the Ninth Circuit Court of Appeals interpreted the phrase "entity's interest in such property" contained in Section 361 as follows: (1) the interest entitled to protection under Sections 361 and 362(d) is "the secured creditors interest and not merely the value of the collateral"; (2) when the creditor is deprived of the specifically agreed benefit of its bargain, the statute requires as a *quid pro quo* that the "value" of its bargain must be adequately protected; (3) the test of adequate protection is two-fold: first, the protection must adequately safeguard principal, and second, the protection must effectively compensate the secured creditor for loss of value; and (4) Congress intended in the Bankruptcy Code to increase the protection provided to creditors against potential injury from the automatic stay against collection efforts.[5]

17. A review of the Debtor's "detailed and comprehensive" statement and plan of adequate protection contained in the Pre-Trial Order shows that the Debtor's offer of adequate protection is at best highly speculative and illusory. The Debtor's own expert witness has testified that it would be "pure speculation" on his part to state whether or not the Debtor is currently

---

**5.** Several bankruptcy courts as well as the Fourth Circuit have followed *American Mariner's* determination that a secured creditor is entitled to receive its lost opportunity costs as adequate protection during the reorganization process:

*Grundy National Bank v. Tandem Mining Corporation,* 754 F.2d 1436 (4th Cir.1985); *In Re Air Vermont, Inc.,* 45 B.R. 931 (Bankr.D.Vt.1985); *In Re Mary Harpley Builder, Inc.,* 44 B.R. 151 (Bankr.N.D.Ohio 1984); *In Re Levine,* 45 B.R. 333 (D.C.N.D.Ill.1984); *In Re Bear Creek Ministorage, Inc.,* 49 B.R. 454 (Bankr.S.D.Tex.1985); *In Re Lilyerd,* 49 B.R. 109 (Bankr.D.Minn.1985); *In Re Polzin,* 49 B.R. 370 (Bankr.D.Minn.1985), *contra; In Re Keller,* 45 B.R. 469 (Bankr.N.D. Iowa 1984); *In Re W.S. Sheppley & Co.,* 45 B.R. 473 (Bankr.N.D.Iowa 1984); *In Re Smithfield Estates,* 48 B.R. 910 (Bankr.D.R.I.1985).

earning any money or profit and that he has made no study of whether indeed they are earning a profit. Similarly, the evidence and facts are clear that the Debtor is incapable of providing substitute liens, replacement liens, additional liens or any other tangible evidence of adequate protection.

18. The balance of the Debtor's offer of adequate protection is similarly illusory. The Debtor proposes to give the Banks the interest payments on the "D & B Company" Note. But this note is already pledged to the Banks and subject to the Banks' liens, and the proposed payments which the Debtor would turn over are simply the proceeds of its existing collateral. Lastly, the Debtor offers to give the Banks a priority lien in all "post-petition assets." Unfortunately, there is no evidence that there are or might ever be any new post-petition assets in this case.

19. The Court finds as a matter of fact and law that the offer of adequate protection contained in the Pre-Trial Order is inadequate under the circumstances for the above reasons. The Court further finds, however, that the Banks as an undersecured creditor can be adequately protected during the reorganization period by cash payments of its "lost opportunity costs". As noted by Judge Wesley Steen in his well-reasoned opinion, *In Re Bear Creek Ministorage, Inc.*, 49 B.R. 454, 457 (Bankr. S.D.Tex.1985), "[adequate protection] payments should be a function of the price that could be realized on foreclosure times the rate of return the creditor could expect on reinvestment of the foreclosure proceeds. Thus the Court must determine the amount that would be realized on foreclosure, the rate of return on the proceeds, and the date when foreclosure would occur and investment return would begin. Obviously, none of these facts is susceptible of determination with mathematical precision." Judge Steen further noted in Footnote 11 that the protection payments should begin on the date on which the right to foreclose was impinged, not on the date of filing the motion for relief from stay.

20. In the case at bar, institution of the bankruptcy proceedings prevented foreclosure by the Bank on August 14, 1985, the realization of approximately $55 million in liquidation value and its immediate reinvestment at a 10.37% rate of return. Thus, in order to compensate the Bank for its "lost investment opportunity costs" during the months involved in the reorganization process, the Bank is entitled to interest on the liquidation value from the date of the foreclosure.

21. If the Debtor were allowed to continue to use the Collateral without compensation, all reorganization costs would be shifted to the shareholders of the Banks in direct contravention of their "benefit of the bargain" contained in the Credit Agreement. As Judge Steen correctly noted in *Bear Creek Ministorage, supra* at 459:

"If the Debtors cannot even fund the present value of foreclosure rights in the collateral, they have little equitable claim to a right to reorganize. Because time runs inexorably, and because money has a time use value, *someone will fund* the time use value of an undersecured debt if the stay remains in force. No statute or court decision can alter that financial fact. The question is *who* will fund it: debtor or creditor. Continuation of the stay without creditor compensation requires the creditor to fund the stay; there is no statutory authority for such a result. To the contrary, the Ninth Circuit correctly concludes, the statute requires protection of the creditor's interest."

22. Based upon the foregoing principles, the Court finds that the following adequate protection payments must be made by the Debtor in order to continue to use the Collateral during the reorganization process:

| | | |
|---|---|---|
| (1) | Principal amount: | $55 million |
| (2) | Interest rate: | 10.37% |
| (3) | Accrual date: | August 14, 1985 |
| (4) | First payment date: | January 6, 1986 (Continuing monthly thereafter on the 6th day of each and every month until confirmation) |

23. If any of the above enumerated adequate protection payments are not made by the Debtor in certified funds. on the due date, the automatic stay provided in Section 362 of the Bankruptcy Code shall automatically lift without further hearing or process before this Court.

## ORDER

Based upon the foregoing Findings of Fact and Conclusions of Law, IT IS ORDERED that the automatic stay provided in Section 362 shall remain in effect in this proceeding conditioned upon payment by the Debtor of the adequate protection payments specified herein.